AARON L. HARDIN v. ILLINOIS CENTRAL RAILROAD COMPANY, Appellant.—70 S. W. (2d) 1075.

Division One, April 19, 1934.

1170

*Watts & Gentry* for appellant; *E. C. Craig* and *Vernon W. Foster* of counsel.

*Eagleton, Henwood & Waechter* and *Allen, Moser & Marsalek* for respondent.

1174

HYDE, C.—This is an action for damages for personal injuries alleged to have been sustained by reason of a violation of the Boiler

Inspection Act, U. S. C. A., Title 45, Section 23. The violation charged was failure to equip a switch engine upon which plaintiff was working with an adequate and sufficient spark arrester. Plaintiff alleged that as a result thereof a large hot cinder came from the engine, struck him in the right eye, and caused him to lose the sight thereof. Plaintiff obtained a verdict for $30,000. The trial court ordered a *remittitur* of $10,000, which was made, and judgment rendered for plaintiff for $20,000. Defendant has appealed from this judgment and makes only one assignment of error, namely: "The court erred in overruling the defendant's demurrer to the evidence offered at the close of all the evidence in the case."

The only account of how plaintiff was injured was his own testimony. According to him, he was injured at 7:30 P. M., June 12, 1928, in the defendant's yards at Matoon, Illinois, when he started with a switching crew on an interstate switching movement. Plaintiff's testimony as to what occurred was as follows:

"At the time I was injured I was standing on the footboard of the engine, which was No. 81. The engine was moving westward in forward motion. I was standing on the right-hand side of the footboard. At the moment of the injury I had turned around on the footboard and was facing the engineer, facing east, reaching up after my lantern to take hold of my lantern. . . . We had just got started, and as the engine started and we moved this ten or twelve feet, we were moving possibly two miles an hour, very slowly. The engine slipped when it first started. By that I mean that when an engineer gives an engine excessive steam it will spin the drivers, as the engine in itself as a whole hasn't gained any momentum; you might say it hasn't moved forward to speak of. . . . This particular spark that I saw coming out of the stack on the occasion of my accident, and that broke on the running board on the right-hand side of the engine, was something like as big as a quarter. It was round like a quarter and about as large in diameter as a quarter would be. That would be right around an inch. I will say maybe seven-eighths, something like that. . . . I was just reaching for my lantern. My lantern was hanging on a hook right in front of the engine on the engineer's side. . . . I saw the cinder that I spoke of. It was a hot cinder about the size of a quarter. It might be cherry-red; yes, I would term it cherry-red, if you would call that red. When I first got a glimpse of that cinder it came out of the smokestack and was falling down about that far from my face, about that far in front of me. I saw it the instant it left the smokestack. Naturally I was interested to see whether it was going down my neck or where it was going, and I rather kept my eye on the movement of that particular cinder and watched it, and it came down and struck this running board on the side of the engine. . . . I would say that the cinder that I have described went a few inches above the smoke-

stack before it commenced to come down. It rolled out of the smoke-stack and fell down. I would say it went up maybe twelve or four-teen inches, something like that. That is where I first saw it, I guess, twelve or fourteen inches above the smokestack. As I looked up to get my lantern, my line of vision went up in that direction. When I first saw the cinder, it was up in the air about twelve or fourteen inches above the smokestack. The wind was blowing from the south, or the breeze was blowing from the southwest, and we were going west. . . . . The part that the cinder landed on was on the step that comes down. . . . . That is just about the place where it landed there on that part of the running board. That is, on that step down from that running board, on the front end of the running board. It might have been a few inches back from the very front end of that step. . . . I don't remember just how far it would be back of a perpendicular line drawn straight down through the smokestack, possibly a few inches, and maybe even with the smoke-stack; I don't just remember the conditions of that. When it broke, it was as if you would pick up a snowball and drop it on something solid, it would bust and naturally fly in all directions. . . . The cinder did that immediately when it hit the metal running board. I saw it fall and kind of throwed my hand like that, jerked my hand down, rather (I was in the act of getting my lantern), but it rather beat me to it, and some of it went in my eye.''

Plaintiff said that one of the switchmen held a lantern while he tried to get this piece of the cinder out of his eye but that he was un-able to remove it; that he then went to his home nearby where he chewed up some chewing gum which he put in his eye against the cinder while a lady visiting there held a glass for him; and that he thus removed the cinder which was embedded in the center of his eye and was the size of a pinhead. He was corroborated in this by the lady and her husband, both of whom said that the substance he removed looked like a cinder, although they did not touch it. Plaintiff returned to the switching crew about eight P. M., but his eye continued to pain him so that he quit work and went to the company's doctor. This doctor testified that he removed a flat piece of rust which had adhered to plaintiff's eyeball over the pupil. The next day plaintiff was sent to an occulist and his eye was found to be infected. After a few days, this doctor sent him to defendant's hospital in Chicago where, after an ulcer developed, an operation was performed upon his eye. Plaintiff lost the sight of his right eye and his evidence was that the eyeball would finally have to be removed.

Plaintiff had the evidence of a former railroad engineer who tes-tified that if a spark arrester, such as was on defendant's switch engine, was in proper working order and the mesh properly aligned it would not be possible for a cinder the size of a quarter in length

or breadth to escape from it; that it should not, when in proper work-ing condition, emit a spark greater than one-eighth of an inch in thickness; and that if a spark the size of a quarter did come through it it would indicate that there was a hole in the netting. On behalf of defendant it was shown that the spark arrester was inspected daily; that it had been inspected on the day plaintiff claimed the cinder got in his eye, on the day before, and on the day after, and that the inspector marked on his report for all three inspections "81 O. K." Inspections were made daily by opening up a door in the front end of the engine and examining the condition of the spark arrester with the aid of a flash light. The inspector did not, however, say that he had any recollection of the condition of the spark arrester on these dates or of the inspections he then made, independent of these reports.

Defendant also produced a large number of witnesses (employees, officials, doctors, internes, patients in its hospital, claim agent and reporter, and the office girl of the oculist to whom plaintiff was first sent), all of whom testified that plaintiff never at any time said that he got a cinder in his eye and most of whom also testified that he said that he got a piece of rust or steel in his eye while making the drop of a car in completing a switching movement (while was intrastate) just prior to the time he testified at the trial he was injured. The original report written at Matoon from plaintiff's statement, when he first appeared for treatment upon which his signature appeared and others made from information given by him while he was in defendant's hospital in Chicago, all showed that he stated that he got rust in his eye, while making the drop switch. Plaintiff denied that he ever told anyone at any time that he got rust in his eye and maintained that he told everyone, to whom he talked or whoever asked him about it, that he got a cinder in his eye.

A blue print offered by defendant containing the dimensions of the switch engine, shows the following measurements, of the designated parts thereof, in height above the level of the floor the footboard upon which plaintiff stood; the top of the smokestack, 14 feet, ½ inch; the floor of the running board, 6 feet, 9 inches; the step of the run-ning board, 5 feet, 3 inches; and the lantern hook 5 feet, 1¼ inches. These measurements also show from a line extended upward from the back of the footboard (at a right angle to the floor of the foot-board) the center of the smokestack would be back 4 feet, 7¾ inches; the front edge of the running board back 6 feet, 8½ inches; the front edge of the running board step back, 5 feet, 6½ inches; and the lantern hook back 2 feet, 4¼ inches. Defendant also had, at the trial, a model of the front end of the engine which contained a spark arrester with netting of the actual size used on the switch engine in question. This spark arrester was made of heavy wire netting set at an angle underneath, on each side of, the smokestack

and above the smokebox. The spaces between the wires in the netting, of this spark arrester and all others used on defendant's system, were three-fourths of an inch long and three-sixteenths of an inch wide. When cinders first come into the smoke box they strike the deflector plate under the spark arrester and are then whirled about against the sides and front of the smoke box before they reach the spark arrester. It was shown that a silver dime could be pushed through these spaces but that a quarter could not be. (The diameter of a dime was given as 11/16ths of an inch and the diameter of a quarter as 15/16ths of an inch.) However, defendant's expert on this subject said that while a cinder the size and thickness of a dime was smaller than the mesh and could go through, he did not think that it would, in ordinary use, go through once in a million times, because, unless it came into one of the spaces in perfect alignment, it would strike a wire so that it would fall back into the smoke box. Since cinders are irregular in shape, not flat and round like coins, and are battered around the smoke box in a whirling motion, the cinders which ordinarily come through would be much smaller than the dimensions of the meshes of the netting. Defendant's expert said also that an object the size of a quarter could not pass through the arrester unless one of the longitudinal wires or two of the perpendicular wires were out. Even if one longitudinal wire was broken a quarter would have to strike the space at an exact perpendicular alignment to go through.

█ The question for decision here is whether plaintiff was entitled to have his case submitted to the jury. Defendant, in its brief, states the issues of fact involved, as follows:

"The controversy between the parties may be briefly stated thus: Was plaintiff's eye injured by reason of a defective condition in the spark arrester permitting the escape of a piece of cinder, which, because of its size, could not have escaped but for such defect? Or was it injured by something having no connection whatever with any alleged defect in the spark arrester, such as a piece of cinder that was small enough to escape from a perfect spark arrester, or a piece of some substance other than a cinder, coming from some place other than the spark arrester?"

Therefore, if there was any substantial evidence that plaintiff's eye was injured by a cinder from the switch engine as large as a quarter, much too large to come through the normal openings in the netting, then the trial court properly overruled defendant's demurrer to the evidence, because a reasonable inference to be drawn from that fact would be that there was a defect in the spark arrester. (Defendant does not dispute this.) [See Orris v. C., R. I. & P. Railroad Co., 279 Mo. 1, 214 S. W. 124.] Defendant, however, contends that plaintiff's testimony that he saw, falling from above the smokestack, a cinder "about as large in diameter as a quarter" is

not substantial evidence that a cinder, larger than could escape if the spark arrester was in proper condition, actually came through the spark arrester, for the following reasons: That defendant's testimony was so overwhelmingly to the contrary as to leave no room to doubt that plaintiff got rust in his eye, not a cinder; that plaintiff's account of how he saw and estimated the size of the cinder and how a piece of it got into his eye is impossible as contrary to physical facts and natural laws; and that such part of his testimony, as is not contrary to physical facts, leaves the matter of a defective spark ·arrester to speculation and surmise and fails to sustain the plaintiff's burden of proof. Taking up these contentions in inverse order, we may say as to the last that it must be conceded that plaintiff's testimony would not be sufficient to show any defect in the spark arrester (and therefore it would fail to show a violation of the Boiler Inspection Act) if we eliminate as impossible, incredible or unsubstantial his estimate of the size of the cinder which he says came out of the smokestack and broke on the running board step. We would then only have evidence that a cinder of unknown size came out of the smokestack; that the piece which was found in plaintiff's eye was only the size of a pinhead; and that such a cinder or a larger one would come through a spark arrester which fully complied with the act. These facts would not be sufficient warrant for a reasonable inference of a defect in the spark arrester and plaintiff's evidence would not, therefore, make a jury case. [New York Central Ry. Co. v. Ambrose, 280 U. S. 486, 50 Sup. Ct. 198, 74 L. Ed. 562; Pennsylvania Railroad Co. v. Chamberlain, 286 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819; Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419; Frver v. St. Louis-San Francisco Ry. Co., 333 Mo. 740, 63 S. W. (2d) 47; Robison v. Chicago & Eastern Ill. Ry. Co., 334 Mo. 81, 64 S. W. (2d) 660.]

██ Considering defendant's second contention, that plaintiff's testimony as to the size and course of the cinder was incredible and impossible, the argument is: First, that the time of its fall was too short for plaintiff to have estimated its size with any degree of accuracy; second, that with the engine moving forward against the wind it was impossible for the cinder to have fallen at the place plaintiff said it did; third, that if it did fall there and break, the pieces would have bounced backward and not forward; and fourth, that a cinder of such size could not have come through the spark arrester because it was found, upon inspections at that time, to be in perfect condition. It is, of course, true that "the court may properly reject evidence which is contrary to physical facts or to known physical laws or which is the result of evident mistake or, in short, when the evidence itself, or other established facts, disclose its inherent infirmity." [Clark v. Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079; Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950.]

This is a rule well established by our own cases as well as by the Federal decisions. [Barr v. Nafziger Baking Co., 328 Mo. 423, 41 S. W. 559; Schupback v. Meshevsky (Mo.), 300 S. W. 465; Monroe v. C. & A. Ry. Co., 297 Mo. 633, 249 S. W. 644, 257 S. W. 469; Kibble v. Q., O. & K. C. Ry. Co., 285 Mo. 603, 227 S. W. 42; Sexton v. Met. St. Ry. Co., 245 Mo. 254, 149 S. W. 21; Hickey v. Mo. Pac. Ry. Co., 8 Fed. (2d) 128; A., T. & S. F. Ry. Co. v. McNulty, 285 Fed. 97 (citing other Federal cases); M., K., T. Ry. Co. v. Collier, 157 Fed. 347 (citing Missouri cases), certiorari denied 209 U. S. 545, 28 Sup. Ct. 571, 52 L. Ed. 920; see, also, 10 R. C. L. 1008, sec. 198; 64 C. J. 357, sec. 344, p. 361, sec. 350; note, 8 A. L. R. 798; note, 21 A. L. R. 141.] "But the province of the jury to pass on the facts must not be invaded and however improbable the testimony of the witness who testifies to a fact, not in itself impossible, may appear in the ordinary course of events its credibility is for the jury." [64 C. J. 357, sec. 354.] "So frequently do unlooked for results attend the meeting of the interacting forces that courts should not indulge in arbitrary deductions from physical law and fact except when they appear to be so clear and irrefutable that no room is left for the entertainment, by reasonable minds, of any other." [10 R. C. L. 1009, sec. 198; Gately v. St. Louis-San Francisco Ry. Co., 332 Mo. 1, 56 S. W. (2d) 54.] Nevertheless, while "the court has the right in any case to determine as a matter of law whether there is any substantial evidence to sustain an issue of fact; but on determining that there is such substantial evidence, it will not go further and determine whether the weight of the evidence is in favor of or against the mooted fact. That is the province of the jury." In rejecting evidence as contrary to physical facts or laws, "the court does not weigh the evidence in the judicial sense of that term." [Clark v. Bridge Co., supra.]

■    The question for our determination is whether plaintiff's testimony as to the size and course of the cinder, a piece of which he claims flew into his eye, is substantial evidence of those facts and not whether the triers of the facts should accept them as true. If reasonable minds could fairly and honestly have two views of the matter from all the evidence, then plaintiff's testimony was substantial evidence of his theory of the facts and it was for the jury to weigh it and determine which view to accept. We think reasonable minds would entertain divergent opinions, as to whether or not plaintiff from his position could see the cinder in the twilight; whether or not he could estimate the size of the cinder with sufficient accuracy, in the time he said he had, as right around an inch, or seven-eighths of an inch, in diameter or about the size of a quarter; whether or not under the circumstances the cinder could fall on the running board step; and whether or not if it did fall there and break, a piece of it could fly forward into plaintiff's eye. He testified positively to all of these

things. While it may be conceded that the occurrence was an unusual one, we cannot say that it was impossible. Something did fly into plaintiff's eye that evening, which caused an immediate serious injury to it, even before infection set in. It would also be unusual for the engine drive wheels to throw a piece of rail rust into his eye, (which is one of defendant's explanations). We think that the accuracy of plaintiff's estimate of the size of the cinder was likewise for the jury to determine, taking into consideration the opportunity he had for making it. We do not think that it so conclusively appears, that reasonable minds would not differ about it, that a railroad man of many years' experience could not see and observe a red hot cinder under such conditions and that he could not tell with reasonable certainty that it was from seven-eighths of an inch to an inch in diameter.

Defendant argues that, because it was shown that a silver dime would go through the mesh of the netting and because there is only one-fourth of an inch difference in the diameter of a dime and a quarter, there could be no reasonable certainty, from plaintiff's estimate, that the cinder was not merely the size of a dime, which would go through the arrester. We think that plaintiff's estimate was reasonably certain, but even this argument of defendant, overlooks defendant's own testimony that even a dime thrown against the netting would not be likely to go through once in a million times; that a cinder with the diameter of a dime would likely be much greater in thickness and therefore could not go through; and that cinders are thrown against the netting at an angle and in a whirling motion so that when the arrester is in proper condition they are beaten up into much smaller pieces than the size of a dime. It overlooks also plaintiff's evidence that when the arrester was in proper condition cinders greater in diameter than one-eighth of an inch should not go through. It is interesting to note that the same contention of impossibility to estimate the size of a cinder was made and held without merit in Campbell v. B. & O. Railroad Co., 58 Pa. Super. Ct. 241 (a defective spark arrester case), where the court said: "We cannot agree with appellant's counsel that the testimony of John Bowser, that he saw red-hot sparks of the size of a ten-cent piece or larger being emitted from the locomotive on the afternoon of a clear day, must be rejected as contrary to well-known natural laws. His credibility, like that of all witnesses, was for the jury." It is also interesting that in Hoover v. Mo. Pac. Ry. Co. (Mo.), 16 S. W. 480, witnesses estimated that sparks and cinders as large as a half dollar were thrown 30 feet high from a locomotive smokestack; and that in Orris v. C., R. I. & P. Railroad Co., 279 Mo. 1, 214 S. W. 124, the plaintiff estimated the size of a cinder, which he saw just as it struck him in the eye, when he put his head out of the engine cab, as "from a quarter of an inch to three-quarters of an

inch" and "from probably the size of a pea or maybe a large grape, in between there some place;" and that no contention of impossibility was made in either case.

As to defendant's contention that plaintiff's testimony was incredible and impossible because the inspector's testimony showed the spark arrester to be in good condition that day, outside of the question of credibility to be passed upon (hereafter discussed), it must be noted that the inspector testified only to his usual course of inspection and not to any independent recollection of the actual condition of the arrester or what he did on those days. The only entry on his inspection report concerning the entire switch engine is merely "81 O. K." There is no direct mention of the spark arrester but he did testify that he inspected it every day by looking at it with a flash light; and that if he had found anything wrong he would have either fixed it himself or would have sent for someone to fix it and would have made a notation of it on his report. This was not such positive overwhelming uncontradicted evidence of the spark arrester's perfect condition as to justify the application of the rule stated by the Supreme Court of the United States in the Chamberlain case, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819 (further discussed *infra*); that an inference of the existence of a particular fact from other proven facts "is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses, consistent with the facts actually proved, from which testimony it affirmatively appears that the facts sought to be inferred did not exist." We hold that plaintiff's testimony raised an issue of fact as to whether a cinder, the size plaintiff described, came out of the smokestack and that the jury could so find, even though the inspection reports did state "81 O. K.," and that if the jury did so find they could reasonably infer that there were broken wires in the spark arrester, at least in the absence of a positive independent recollection of the inspector as to what he did in making the inspection on those particular days and what condition of or how much of the spark arrester he actually observed.

This brings us to a consideration of defendant's contention that its demurrer to the evidence should have been sustained because defendant's testimony so overwhelmingly showed that plaintiff never got a cinder in his eye as to leave no room for doubt about it. Defendant argues in this connection that plaintiff's evidence is unsubstantial as to the size of the cinder, the manner in which he claims it got into his eye (both of which we have just considered) and also as to whether a cinder got into his eye at all.

Upon this latter question, it relies both upon the inspection reports of the condition of the spark arrester (which we have discussed) and also upon plaintiff's many alleged statements that he got rust in his eye while making the drop switch. At least twenty

witnesses testified, on behalf of defendant, that plaintiff made such statements. Plaintiff denied making them, generally and specifically. [For a discussion of the effect of inconsistent statements which plaintiff did not even deny making see Parrent v. Mobile & Ohio Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068; see, also, Steele v. K. C. So. Ry. Co., 302 Mo. 207, 257 S. W. 756; and Erie Ry. Co. v. Rooney, 186 Fed. 16.] Can we, in ruling a demurrer to the evidence, disbelieve plaintiff's testimony at the trial that he did get a cinder in his eye, in the manner he stated, and hold that it is established so that reasonable minds could not differ about it, by the testimony of defendant's witnesses as to plaintiff's prior statements (aided by the inspection reports) that plaintiff got a piece of rust in his eye while making an intrastate switching movement. █ Defendant says we can and should and that the Federal rule for deciding a demurrer to the evidence requires us to do so. We recognize that, whatever the Federal rule is, we must follow it in determining the sufficiency of evidence to show a violation of the Federal Boiler Inspection Act (Western & Atlantic Railroad v. Hughes, 278 U. S. 496, 49 Sup. Ct. 231, 73 L. Ed. 473, and cases cited). Defendant states the Federal rule to be, as follows:

"Ordinarily, conflicts in statements made by various witnesses are to be determined by a jury, nevertheless, in a case where the evidence is so overwhelming on one side of an issue that it can be said to be practically all one way, or to leave no doubt as to what the fact is, then . . . it is the duty of the trial court to give a peremptory instruction against the one whose evidence is so weak that it clearly appears that it is untrue."

Defendant then applies this rule to its evidence, as follows:

"All this testimony, especially the record evidence, establishes so conclusively the fact that plaintiff was injured by some object, other than a cinder, which flew into his eye in the course of the discharge of his duties without any negligence whatever on the part of the defendant, that two disinterested, fair-minded men could not differ on the conclusion that the story told by plaintiff at the trial—wholly without corroboration and in the face of physical facts—is unworthy of belief."

Defendant, therefore, clearly asks us to weigh its own evidence against plaintiff's and to pass upon the credibility of its witness and the credibility of plaintiff in doing so. It contends that it is the function of the court to do that in ruling a demurrer to the evidence. In short, defendant wants to substitute part of its own evidence for most of plaintiff's evidence and have the demurrer ruled on that combination. The Federal rule prohibits this just as does our own. This is apparent from the very nature of a demurrer to the evidence as shown by the history of its origin. Under the common law, a demurrer to the evidence set out the facts admitted (64

C. J. 376, sec. 371; 26 R. C. L. 1064, sec. 7); and the defendant could not compel the plaintiff to join in it, so that it could even be passed upon by the court "without distinctly admitting upon the record, every fact and every conclusion which the evidence given for the plaintiff concluded to prove." [Gibson v. Hunter, 2 H. Bl. 187, 209.] Chief Justice MARSHALL long ago stated the rule, on a demurrer to the evidence, thus: "The party demurring admits the truth of the testimony to which he demurs, and also those conclusions of fact which a jury may fairly draw from that testimony. Forced and violent inferences he does not admit; but the testimony is to be taken most strongly against him, and such conclusions as a jury might justifiably draw, the court ought to draw. . . . Although the judges who compose this court might not, perhaps, as jurors, be perfectly satisfied with this testimony, they cannot say that a verdict would not be received, or ought not to be received, which would find the issue in favor of the defendants below." [Pawling v. United States, 4 Cranch, 219, 2 L. Ed. 601.] Likewise, Mr. Justice STORY, citing Gibson v. Hunter, supra, said that "the true and proper object of such a demurrer is, to refer to the court the law arising from facts;" that "it supposes, therefore, the facts to be already admitted and ascertained;" that "it is no part of the object of such proceedings to bring before the court an investigation of the facts in dispute, or to weigh the force of testimony, or the presumptions arising from the evidence;" that "that is the proper province of the jury;" and that it is not proper *"to let in defendant's evidence, and thus to rebut what the other side aimed to establish, and to overthrow the presumptions arising therefrom by counter presumptions."* [Fowle v. Alexandria, 11 Wheat. 320, 6 L. Ed. 484.] In the Federal courts, a motion to direct a verdict and a demurrer to the evidence are tested by the same rules. [Chesapeake & Ohio Ry. Co. v. Martin, 283 U. S. 209, 51 Sup. Ct. 453, 75 L. Ed. 983; Morris, Executor, v. Giddings, 115 U. S. 300, 6 Sup. Ct. 65, 29 L. Ed. 403; Schuchardt v. Allen, 1 Wall. 359, 17 L. Ed. 642.] This is, of course, likewise true of a request for a peremptory instruction under our practice. [Lee v. David, 11 Mo. 114; Thompson v. Main Street Bank (Mo. App.), 42 S. W. 56; American Car & Foundry Co. v. Kettelhake, 236 U. S. 311, 35 Sup. Ct. 355, 59 L. Ed. 591.] The province of the jury in the Federal courts has also been announced by the Supreme Court of the United States, as follows: "Where there is any discrepancy, however slight, the court must submit the matter to which it relates to the jury, because it is their province to weigh and balance the testimony and not the court's." [Barney v. Schmeider, 9 Wall. 248, 19 L. Ed. 648.] There is another principle correlated with these rules, namely: "In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence,

but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed. . . . In the discharge of this duty it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor. Not whether on all the evidence the preponderating weight is in his favor; that is the business of the jury, but conceding to all the evidence offered the greatest probative force which according to the law of evidence it is fairly entitled to, is it sufficient to justify a verdict." [Pleasants v. Fant, 22 Wall. 116, 22 L. Ed. 780.] In determining this question, the court has further said: "There is no doubt of the power of the circuit court to direct a verdict for the plaintiff upon the evidence presented in a cause, where it is clear that he is entitled to recover, and no matter affecting his claim is left in doubt to be determined by the jury. Such a direction is eminently proper, when it would be the duty of the court to set aside a different verdict, if one were rendered. It would be an idle proceeding to submit the evidence to the jury, when they could justly find only one way." [North Pennsylvania Railroad Co. v. Commercial National Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287.] Nevertheless, "where a cause fairly depends upon the effect or weight of testimony, it is one for the consideration and determination of the jury." [Phoenix Mutual Life Insurance Co. v. Doster, 106 U. S. 30, 1 Sup. Ct. 18, 27 L. Ed. 65.]

These principles are restated and followed in all of the most recent decisions of the United States Supreme Court. In Baltimore & Ohio Railroad Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419, there was evidence of many witnesses for defendant to show that an engine, the boiler of which exploded, was in good condition prior to the day of the explosion. One witness testified for plaintiff that he saw a defective condition. In ruling the demurrer (the evidence was held sufficient to make a case for the jury) the court said: "We are bound to assume that the condition of the boiler at Foster . . . was as indicated by the testimony of the brakeman above referred to. His credibility and the weight properly to be given to his testimony were for the jury."

In Western & Atlantic Railroad Co. v. Hughes, 278 U. S. 496, 49 Sup. Ct. 231, 73 L. Ed. 473, the court stated the matter, as follows: "It is true that submission to the jury of contested issues of fact is not required in the Federal courts, if there is only a scintilla of evidence; . . . that it is the duty of the judge to direct the verdict, when the testimony and all inferences which the jury could justifiably draw therefrom would be insufficient to support a verdict for the other party. . . . Some of the testimony given by witnesses called by the plaintiff does not seem to us persuasive. But the credibility of the witnesses and the weight of the evidence were

obviously matters for the jury. The defendant was not entitled to a directed verdict.''

In Gunning v. Cooley, 281 U. S. 90, 50 Sup. Ct. 231, 74 L. Ed. 720, where plaintiff's disputed evidence as to the results of treatments by defendant (a physician) was held sufficient to make a case for the jury, of negligence in using a harmful fluid, without showing specifically what was used, the court said: ''Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury. And in determining a motion of either party for a peremptory instruction, the court assumes that the evidence for the opposing party proves all that it reasonably may be found sufficient to establish, and that from such facts there should be drawn in favor of the latter all inferences that fairly are deducible from them. (Citing cases.) Where uncertainty . . . arises from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury. (Citing cases.) Where the evidence upon any issue is all on one side or so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury.'' (See, also, the other United States Supreme Court decisions collated in the footnote to this case and to the Groeger case.)

These principles are similarly stated in Chesapeake & Ohio Ry. Co. v. Martin, 283 U. S. 209, 51 Sup. Ct. 453, 75 L. Ed. 983, where the only evidence as to what was a reasonable time was the testimony of one of defendant's employees. Plaintiff not only had no evidence to the contrary but had no evidence on the subject at all and, under these circumstances, the court said that, in passing upon a demurrer to the evidence, ''the court . . . is not at liberty to disregard the testimony of a witness on the ground that he is an employee of the defendant, *in the absence of conflicting proof or circumstances justifying countervailing inferences or suggesting doubt* as to the truth of his statement, unless the evidence be of such a nature as fairly to be open to challenge as suspicious or inherently improbable. . . . The question of the credibility of witnesses is one for the jury alone; but this does not mean that the just is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt.'' The court, however, also said that, in ruling upon a demurrer to the evidence, ''*the court must resolve all conflicts in the evidence against the defendant.*''

In Southern Ry. Co. v. Walters, 284 U. S. 190, 52 Sup. Ct. 58, 76 L. Ed. 239, where the issue was whether or not defendant's train stopped at a certain street crossing, the court held that a verdict should have been directed for the defendant, because plaintiff's theory

was based on inferences attempted to be drawn from testimony concerning the movement of the train after it passed the crossing, which court said "amounts to mere speculation in view of the limited scope of the witnesses' observation, the down grade of the railway tracks at the point, and the time element involved." No witness for plaintiff stated that he observed the train before it was passing over the crossing. The court also said: "An examination of the record requires the conclusion that the evidence on the issue whether the train was stopped before crossing Bond Avenue was so insubstantial and insufficient that it did not justify a submission of that issue to the jury;" and said further: "There is no proof whatever that the alleged failure to stop before entering the crossing was the proximate cause of the plaintiff's injury" because his own evidence "indicates a collision between him and the side of the train after the front part . . . had passed him."

In Pennsylvania Railroad Co. v. Chamberlain, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819, much relied upon recently as authority for the proposition that, where there is a direct conflict between the witnesses of the adversary parties, the court may, on ruling a demurrer to the evidence, reject the evidence of one party entirely and consider the matter settled to the contrary because of numerical superiority or greater credibility of witnesses on the other side, the court said that "here there really is *no conflict in testimony as to facts;*" and that it was "a case belonging to that class of cases where proven facts (by plaintiff's own evidence, which did not conflict with defendant's) give equal support to each of two inconsistent inferences; in which event, neither of them being established (plaintiff's theory was not therefore a reasonable inference to draw from all the facts shown by plaintiff's evidence), judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover." (Parenthetical statements ours.)

The court went further and said: "The desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses (of defendant) *consistent with the facts actually proved* (by plaintiff), from which testimony it affirmatively appears that the fact sought to be inferred did not exist." In support of this proposition the court cited several Missouri decisions, of which Rashall v. St. L., I. M. & S. Ry. Co., 249 Mo. 509, 155 S. W. 426, is a fair example. There this court held that plaintiff's evidence did not make a humanitarian negligence case for the jury on the theory that plaintiff was actually seen in peril when it was merely shown that the trainmen (with no duty to be on the lookout for plaintiff) were

in their places, and the trainmen testified that they did not see him. This court said: "That necessarily does away with any merely disputable (conjectural?) presumption that plaintiff was seen in a position of peril, which might have arisen before the advent of that evidence upon his statement that he was within seeing distance." Quaere: Does this rule mean anything more than that, from the plaintiff's evidence, no inference that the fact was true (that plaintiff was seen in the Rashall case and that there was a collision in the Chamberlain case) can be reasonably and fairly drawn, without some further supporting circumstances, because it would be mere speculation and conjecture; and that defendant's evidence did not help plaintiff by supplying such circumstance but was "*consistent with the facts actually proved*" by plaintiff and tended to show only the contrary?

Nevertheless, no matter what may be the rule as to positive direct evidence precluding contradicting inferences, there is no rule, of either our courts or of the Federal courts, as to a clear conflict in the direct testimony of witnesses of opposing parties, whereby the positive direct testimony of one party's witness or witnesses, as to facts, can be disregarded by the court, and the other party's directly contradictory testimony, as to the same facts, be substituted therefor because of numerical superiority, greater weight, or higher credibility of his witnesses, for the purpose of determining the facts to which it will apply the law in ruling on a demurrer to the evidence. The United States Supreme Court clearly recognizes this in the Chamberlain case, saying: "Where there is a direct conflict of testimony upon a matter of fact, the question must be left to the jury to determine, without regard to the number of witnesses upon either side."

We think the Chamberlain, Walters and Rashall cases (also New York Central Railroad Co. v. Ambrose, 280 U. S. 486, 50 Sup. Ct. 198, 74 L. Ed. 562; Gulf M. & N. Railroad Co. v. Wells, 275 U. S. 455, 48 Sup. Ct. 150, 72 L. Ed. 370; C., M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 46 Sup. Ct. 564, 70 L. Ed. 1041) are all good examples of what is meant by only a scintilla of evidence. This court, in Koonse v. Missouri Pacific Ry. Co., 322 Mo. 813, 18 S. W. (2d) 467, certiorari denied 280 U. S. 582, 50 Sup. Ct. 34, 74 L. Ed. 632, said that "a scintilla of evidence signifies merely speculation and conjecture . . . inferences from facts tantamount to speculation and conjecture." But as stated in 23 Corpus Juris, 9, section 1733: "The fact that several witnesses contradict a party's unsupported statement does not make his statement a mere scintilla of evidence." [See, also, D., T. & I. Ry. Co. v. Hahn (C. C. A.), 47 Fed. (2d) 59; A., T. & S. F. Ry. Co. v. Condos (C. C. A.), 30 Fed. (2d) 669; U. S. S. Co. v. Barber, 4 Fed. (2d) 625; Gill v. B. & O. Railroad Co., 302 Mo. 317, 259 S. W. 93, certiorari denied, 265 U. S. 592, 44 Sup. Ct. 636, 68 L. Ed. 1196.]

The contention that this court has misconceived its duty, in passing upon a demurrer to the evidence in cases arising under the various Federal laws relating to railroads, has been made so seriously and frequently recently, that we have felt warranted in discussing the decision of the United States Supreme Court so extensively in this case. However, our conclusion is, as expressed in Grange v. Chicago & Eastern Illinois Ry. Co., 334 Mo. 1040, 69 S. W. (2d) 955, that "we do not believe that this court entertains views which are in conflict with the high Federal courts on this subject."

■ Of course, evidence of facts, from which it is only possible to reach a desired inference by entering the realm of speculation and conjecture, does not meet the test of showing facts from which such an inference may be fairly and reasonably drawn. Whether reasonable minds would differ or could fairly draw but one conclusion is the final test. As heretofore noted, defendant makes no claim that the existence of a defect in the spark arrester, which would be a violation of the Boiler Inspection Act, is not a fair and reasonable inference which the jury could properly draw, if the fact was established that a cinder, as large as seven-eighths of an inch in diameter, came out of the smokestack. Defendant's contention is that plaintiff's evidence is so unsubstantial that the court must say that it is no evidence of that fact. Defendant says it is unsubstantial both because plaintiff's testimony that he saw a cinder of that size, and that part of it went into his eye, could not be true (incredible because plaintiff did not have time or opportunity to estimate it and impossible because contrary to physical facts), and because defendant's witnesses testified that plaintiff made statements (which he denied making) to the contrary. We hold that plaintiff's testimony of what happened, if true, and his estimate of the size of the cinder, if believed to be accurate, was sufficient for the jury to find that a cinder, of sufficient size to warrant the inference of a defective spark arrester, came out of the smokestack and caused the injury to his eye, and that it was for the jury to say whether or not his testimony was true, and his estimate correct, and whether they would draw such an inference from it.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.*, concur.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, absent.