Harry L. CLOSSER, Respondent,

v.

Byron W. BECKER, Appellant.

No. 45828.

Supreme Court of Missouri,
Division No. 1.

Jan. 13, 1958.

W. Raleigh Gough and Claude M. McFarland, Kansas City, for appellant.

Frank L. Cohn, R. Robert Cohn, Kansas City, for respondent.

HOLLINGSWORTH, Presiding Judge.

Plaintiff recovered judgment in the sum of $25,000 for personal injuries sustained when struck by defendant's truck near the intersection of 27th and Bales Streets in Kansas City, Missouri. The cause was submitted to the jury upon the sole ground of humanitarian negligence. Defendant has appealed. The principal contention is that no submissible case was made. Error is also assigned in the admission of evidence and allegedly prejudicial misconduct of a juror.

The casualty occurred between 9:20 and 9:30 on the morning of June 2, 1952, a clear, dry day. Plaintiff, then about 64 years of age and in good health, was a truck driver for the Albert Tamm Lumber Company. About 9:00 a. m., he left his employer's yards driving a truck loaded with lumber. The lumber was held in place by four upright stakes on each side of the flat truck bed and by a chain, the ends of which were attached to hooks on each side of the bed. Atop the load, which reached the approximate height of the stakes, was a roll of builder's paper, not fastened to the truck in any manner. Plaintiff drove southward on Indiana Avenue to 27th Street, an east-west street, where he made a left turn to the east. As he made the turn, the roll of paper fell from the truck. He stopped the truck, picked up the paper, tossed it up on the load and then drove the truck eastward on 27th for about two-thirds of a block to a point near Bales Street, the first street east of Indiana. He there parked the truck adjacent to the south curb of 27th at a point between driveways leading into an automobile service station on the south side of 27th. The outside dual right rear wheel of the truck was against the curb and the right front wheel was north of the curb to the extent of the width of the outside rear dual wheel.

In that block, 27th Street is 40 feet, 2 inches wide between the curbings. Plaintiff's truck was 23 feet long, 6 feet, 5½ inches wide. After parking, plaintiff stepped from the truck and was immediately north of it in 27th Street when defendant drove his truck, loaded with milk, eastward on 27th, passing along the north side of plaintiff's truck, at which time plaintiff was struck by defendant's truck and was severely injured. Defendant's truck was 21 or 22 feet long. The cab was about 8 or 9 feet long and 6 feet in width. Back of the cab was a solidly enclosed metal box bed, 12 feet long and apparently

5 or 6 feet high. The width of the box bed was 80 inches. Rear fenders extended outward from the bed an additional 2½ inches on each side, giving it an over-all width of 85 inches at its rear fenders.

Plaintiff testified: As soon as he parked the lumber truck, he got out on the left side of it, at which moment there was no traffic coming from the west. He took a rope from the "bump board" at the rear of the cab, placed a loop priorly tied in one end thereof into a hook affixed to the bed near the front standard, stepped back two or three steps and, while holding the loop in place, threw the rope over the top of the load of lumber, preparatory to going to the south or right side of the truck and there fastening the rope to a hook in the bed on that side, for the purpose of thereby securing in place the roll of building paper. At that moment he saw traffic coming eastward across Indiana Avenue. He stepped up against the side of the truck, facing his load of lumber, with his chest against the truck and his right arm extended upward along the left front standard, which was two or three feet back of the cab. His body, he thought, was about one foot thick. He did not look toward the oncoming traffic, but remained in the position he had taken. He heard either two or three eastbound cars pass to the rear of him. The "next thing that happened * * * I was laying in the street." He had no memory of being hit, "guessed" he was "knocked unconscious", but could hear people talking. Eventually, he was taken to St. Mary's Hospital but had no memory of that fact. Neither did he remember talking to any police officers at the hospital. His first memory was of talking to his wife, except that he remembered "hurting all over" as he lay upon the street and that he was bleeding. Plaintiff later testified, however, that he talked, or may have talked, with police officers at the hospital but said he did not tell them, or at least did not remember telling them, that he was pulling on the rope and fell into defendant's passing truck.

Mrs. Grace Puckett, called as witness in behalf of plaintiff, testified: At the time and place above mentioned she had driven her Chevrolet automobile westward on 27th Street to Bales and was near the east side of the intersection, with the left wheels of her car upon the center of the street. Her left hand was extended from her car, as a signal of her purpose to make a left turn southward on Bales, as soon as traffic permitted. At that moment she saw defendant's "Sunshine milk truck" eastbound on 27th Street about midway between Indiana and Bales. The approach of defendant's truck caused her to delay her left turn to await his passage. Defendant was looking directly toward her. She watched defendant and did not at first observe plaintiff or his parked lumber truck. Defendant's truck was at all times south of the center of 27th Street and it came "straight on" without changing its course. She saw plaintiff "just as he got hit." He was standing near the cab of his truck with his back to defendant's truck. "When he (plaintiff) was hit, he spun around in the street, staggered over toward his own truck and then fell back in the street. * * * the milk truck hit him, caught him some way. He didn't fall against the milk truck." Defendant's truck continued its straight course eastward, entirely south of the center of 27th Street. As defendant drove by the south side of her car, she told him that he had killed a man. Defendant did not answer, she thought, but he stopped his truck immediately.

The witness further testified:

"Q. Mrs. Puckett, are you able to tell what distance separated the milk truck as it passed the lumber truck?"

*    *    *    *    *    *

"A. Well, I just couldn't say the distance, if I was going to say the distance I would say, oh, six foot, or something would be the nearest estimate I could make."

*    *    *    *    *    *

"Mr. Gough: I move to strike the answer of the witness, 'six feet', as

showing on its face that it is a mere guess. * * * "

*   *   *   *   *   *

"Q. (By Mr. Cohn) Let's get at it, if you can't tell us in feet, can you show us by your hands about the distance that separated the two ?"

*   *   *   *   *   *

"A. I couldn't reach—(illustrating).

"Q. Now, Mrs. Puckett, what is it you are describing then, the distance between the two trucks? A. Well, the trucks was close together and that's all I can tell you. I can't tell you how far it was.

"Mr. Gough: I again move to strike out the answer of the witness, 'close' being a relative term, this being a mere conclusion on the part of the witness.

"The Court: Overruled."

On cross-examination, the witness testified: The back fender of defendant's truck struck plaintiff. She saw the plaintiff just as he got hit and she "thought" he was getting out of his truck. She saw no movement of plaintiff toward defendant's truck before it struck him. At the time plaintiff was hit he wasn't doing anything.

As a part of his case in chief, plaintiff introduced in evidence portions of a deposition priorly given by defendant. In that deposition defendant admitted that he was two-thirds of a block from plaintiff when he first saw him; that plaintiff was then standing a foot or two from his truck and had hold of a rope; "he was kind of at an angle pulling down, kind of facing southwest"; that plaintiff never faced defendant and defendant continued to watch him; that he never saw plaintiff move from that position and plaintiff never looked toward defendant; that when he was 100 feet west of plaintiff he (defendant) was traveling about 18 miles per hour and could have stopped his truck within 30 to 35 feet.

The trial court admitted into evidence records relating to plaintiff's admission to St. Mary's Hospital, his condition when admitted, progress, diagnosis and treatment while confined there. Defendant objected to a portion thereof appearing under the heading "Emergency Record", which recited, "Car accident this A. M., unable to get detailed history in A. M." The objection was overruled and further portions of the record were admitted without objection. It showed (as read to the jury by plaintiff's counsel): " * * * Diagnosis, multiple injuries, traumatic, 1. Extensive scalp laceration and contusion. 2. comminuted fracture of the right scapula. 3. diffuse abrasions of the back and upper extremities. 4. ligamentous strain of back. 5. multiple rib fractures right chest. 6. shock. * * * Name of operations, procedures and treatment. 1. symptomatic. 2. sutures of scalp. 3. reduction of scapula fracture and immobilization. * * * Emergency Record: History, 10 A. M., m.s. grain one-quarter, b.p. 180. History, car accident this A. M., unable to get detailed history in A. M. Severe pain right lower ribs, abdominal spasm, laceration of scalp, given m.s. grain one-fourth, scalp laceration closed by Dr. Duncan. To X-ray, then admit. * * * Progress Record, June 2, 1952, admitted in severe shock from being struck by car, extensive head scalp laceration and concussion, fracture of right scapula, and ribs, back injury possible ruptured spleen. * * * June 3—patient still in serious condition but improving."

Dr. William Duncan testified in behalf of plaintiff: He is a physician specializing in traumatic and general surgery. He saw plaintiff between ten and eleven a. m. on June 2, 1952, at St. Mary's Hospital in the emergency room, where he began an immediate examination of him, sewed his wounds, and treated him for shock, which took about half an hour. He stayed with plaintiff another hour and one-half, then saw him several hours later. Plaintiff was bleeding profusely from a large laceration

on the front part of his scalp, near the hairline. He was obviously in shock, his blood pressure was down and he was unconscious. About three hours later he was semi-conscious and complaining, seemed to be suffering pain in back and right shoulder. His condition was critical. The witness gave instructions that plaintiff should not have any visitors and prescribed complete rest. Later in the day, plaintiff had improved, but still was in serious condition; not mentally alert.

The doctor was permitted to testify over objection of defendant that in his opinion plaintiff was not mentally able to carry on a coherent conversation with anyone on the day of his admission to the hospital; that he was able only to recognize his wife on that day; and that he did not recover full possession of his faculties until the next day. He further testified:

"Q. Doctor, from your experience as a doctor you could determine whether a man was rational or irrational, could you not? A. Yes, sir.

"Q. What would you say about Mr. Closser the first day there? A. I would say he was semi-conscious after the first two or three hours.

"Q. What would you say about his being rational or not rational? A. He was not too rational."

Defendant testified: Driving his milk truck east on 27th Street, he stopped on the west side of Indiana to await a change in the traffic lights. There were two passenger automobiles in front of him and his truck was entirely south of the center line of 27th Street, but north of cars parked on the south side of the street. When the traffic light changed, the two cars in front of defendant went ahead fairly fast. When they were 125 feet ahead of him, he saw them "pull" to the left. When the front car "pulled" to the left, he saw plaintiff standing by his truck, which was parked at the curb in front of the service station. Plaintiff was standing by "that first stake from the rear of the cab", within a "foot and a half or two" of the truck. He saw plaintiff in that position as he crossed Indiana. Defendant "pulled" his left wheels north of the center of 27th—there was no westbound traffic—he had plenty of time and could have passed plaintiff in safety if he had continued in a straight course, but did "pull over." He was then traveling 20 miles an hour but decreased his speed to 18 miles per hour as he passed plaintiff. Plaintiff was at all times in plain view and was "slightly turned" to the northwest. Plaintiff never moved from the position in which defendant first saw him or changed the direction in which he faced. He appeared to be pulling "down" on a rope. Defendant, looking "kind of cater-cornered from" his windshield, continued to observe plaintiff until the front of his truck had passed. At that time, plaintiff still had not moved and was "pulling down on this rope." Defendant never knew his truck had any contact with plaintiff until "this woman (Mrs. Puckett) wiggled her hand at me" and he heard some one say "struck a man", or words to that effect. Defendant immediately parked his truck and went back to the scene of the collision. There was a rope lying in the street and blood on the street where plaintiff's head was lying.

On cross-examination, defendant testified: When he was 75 or 100 feet west of plaintiff, he "drove out gradually" to the north of the center of 27th Street, slowing his truck as he did so. As he came near to the rear of plaintiff's truck, he saw the automobile of Mrs. Puckett slowing up at the intersection of Bales and saw her signaling her intent to make a left turn. He looked at plaintiff. About the time he had passed plaintiff, he turned his truck back to the south side of 27th Street to avoid striking Mrs. Puckett's car. He was then 65 to 70 feet west of her car.

Police officers testified in behalf of defendant: They were called to the scene about 9:36 a. m. They took photographs

of the street and the cars involved, but not of plaintiff. He lay upon the street with his head 13 feet north of the south curb of 27th Street. He was bleeding from his head. No blood was seen upon the pavement except immediately next to his body. The right rear wheel of defendant's truck had a small amount of fresh blood and hair on it. There was no evidence of any other contact of the truck with plaintiff. They did not talk to plaintiff at the scene of the collision. They made a written report and later drew a chart of what they had learned at the scene. They could not remember when their report was filed. They went to the hospital on the same day, within 3 or 4 hours after leaving the scene of the casualty, where they secured permission from "a man" to see plaintiff. Plaintiff was responsive and they "felt" he was rational about the answers he gave. The version of the police officers as to their conversation with plaintiff, as testified by one of them, was:

"We walked into this hospital room after obtaining the permission, and as I recall it, he was lying on a bed and his head was wrapped up in gauze, and I asked him if he was Mr. Closser and he stated that he was, and I asked him what happened in regard to this accident and he said that he was tying a roll of tar paper on top of a truck when the rope either broke or slipped, and he fell backwards and he didn't know what happened."

On cross-examination, the officers admitted they did not include in their report any reference to their being to the hospital or the statement made to them by the plaintiff, although the purpose of their investigation was to determine and report on the cause of the casualty. They also admitted that the blood stains shown in a picture taken by them were not to exceed five feet from plaintiff's truck.

Defendant contends there was no evidence that plaintiff was in a position of imminent peril at a time when defendant, in the exercise of the highest degree of care, could have avoided injuring him. His argument in support of that contention runs thus: The burden was upon plaintiff to show the "relative positions" of (a) the plaintiff and (b) defendant's truck, and the course of the truck immediately prior to the accident; that the only possible theory of the course of the latter was that it was coming parallel to plaintiff's truck; that, therefore, plaintiff could not have been in a position of imminent peril unless defendant's truck was driven within a foot or less of the side of plaintiff's truck; and that the testimony of Mrs. Puckett to the effect that as defendant passed plaintiff's truck their vehicles were further apart than she (illustrating) could reach, of necessity, destroys plaintiff's case.

The undisputed evidence is that plaintiff stood in close proximity to the lumber truck from the time defendant first saw him until the front end of his truck had passed plaintiff. During all of that time, plaintiff was in full view of defendant. The principal issue of fact was whether defendant drove his truck against plaintiff as plaintiff stood in the position in which defendant first saw him or whether plaintiff fell backward into the side of defendant's truck as it passed by him.

█ If the evidence supports the first of these hypotheses, then plaintiff made a submissible case under the humanitarian doctrine. This for the reason: Plaintiff's testimony tended to show that he stood at a point which he believed to be a position of safety from oncoming traffic. Defendant was chargeable with knowledge that plaintiff was in imminent peril if defendant pursued a course of travel so as to strike him. Defendant consciously drove his truck toward plaintiff with full knowledge that due care on his part required that he avoid striking plaintiff while he stood in his present position. There was ample space and the flow of traffic was such as to permit him to do so. When defendant was 75 or 100 feet to the west of plaintiff, he drove his milk truck at a speed of 18 to 20 miles per hour "out

gradually" to the north to avoid plaintiff. As his truck was passing plaintiff, defendant noticed Mrs. Puckett's car and turned his truck back to the south so as to pass south of her car. It follows that if defendant's truck struck plaintiff as he stood beside the lumber truck, then, patently, the jury could find that plaintiff was in imminent peril from the time defendant started to drive "out gradually" to avoid him; and that, in the exercise of the highest degree of care, defendant could have avoided striking him.

We, therefore, consider defendant's contention that there was no substantial evidence to support a finding that plaintiff continued to stand by the lumber truck until he was struck by defendant's truck. He says Mrs. Puckett's testimony to the effect that defendant's truck "came straight on, didn't turn at all" and that as it passed the lumber truck the two vehicles were separated further (illustrating) than she could reach cancels out or destroys her testimony that defendant's truck struck plaintiff as he stood by the lumber truck.

Obviously, both of the statements are the estimates of a woman not skilled in matters of this nature. The statement that the truck "came straight on, didn't turn at all" hardly would be construed to mean only that the two trucks were precisely parallel. It must be remembered that only a slight outward variation from a true parallel line would have permitted the front end of defendant's truck to pass plaintiff and the rear end to strike him as it went by him as defendant was driving it "out gradually" to the north. In fact, defendant's own testimony is that as he approached and was passing plaintiff he was driving northeast and that upon seeing Mrs. Puckett's car he changed to a southeast direction. Hence, it seems probable from defendant's own testimony that Mrs. Puckett erred in respect to the precise course of defendant's truck, but we do not think it destroyed her apparently intended meaning that defendant's truck at all times was south of the centerline of 27th Street.

■ As to her estimate of the distance between the vehicles: Her testimony was positive and clear that she saw the rear end of defendant's truck strike plaintiff as he stood still by the lumber truck. Of course, if that be true, then she was wrong in her estimate of the distance between the vehicles. The discrepancy goes to the weight of her testimony, but it does not destroy her testimony that the truck struck plaintiff as he stood by the side of the lumber truck. Mooney v. Terminal Railroad Association of St. Louis, 353 Mo. 1080, 186 S.W.2d 450, 454; Holmes v. McNeil, 356 Mo. 846, 204 S.W.2d 303, 306; Lesch v. Terminal Railroad Association, Mo.Sup., 258 S.W.2d 686, 689; Caswell v. St. Louis Public Service Co., Mo.Sup., 262 S.W.2d 40, 45; Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W.2d 70, 73; Suarez v. Thompson, Mo.Sup., 283 S.W.2d 584, 586.

■ Defendant further contends that plaintiff's case was based upon "circumstantial evidence" and that the evidence does not warrant a verdict upon that theory. Defendant errs in so contending. There was direct evidence from which the jury was warranted in finding, as it did, that plaintiff came into and remained in a position beside the truck in imminent and discoverable peril when defendant, chargeable with knowledge of plaintiff's peril, thereafter pursued a course of travel that would bring his truck into contact with plaintiff as he then stood; and that defendant, in the exercise of the highest degree of care, could and should have avoided striking him.

Defendant also contends that the undisputed physical facts destroy plaintiff's case. He says plaintiff's testimony that the last he "remembered" was that he was standing still beside the truck cannot be regarded as substantial evidence that he was standing still at the instant he was struck, citing

McGuire v. Steel Transportation Co., 359 Mo. 1179, 225 S.W.2d 699, 701–702, and Fries v. Berberich, Mo.App., 177 S.W.2d 640, 643. A careful reading of both of those cases fails to reveal any support whatever to plaintiff's contention. However, inasmuch as we have held that Mrs. Puckett's testimony that plaintiff was standing by the lumber truck when struck by defendant's truck was competent evidence of that fact, we need not further consider the contention.

On the score of the submissibility of plaintiff's case, defendant finally contends that the uncontradicted evidence of the police officers that the only indication of *any contact of the defendant's truck with* plaintiff was small spots of blood and hair on the rim of the outer right rear wheel of the truck shows plaintiff's evidence to be in conflict with established physical facts and that plaintiff's evidence must, therefore, be repudiated. In support of that contention he has cited us to numerous cases, typical of which is Hardin v. Illinois Central R. Co., 334 Mo. 1169, 70 S.W.2d 1075, 1079. That case, as do the others cited, holds that "the court may properly reject evidence which is contrary to physical facts or to known physical laws, or which is the result of evident mistake or ignorance, or, in short, when the evidence itself, or the other established facts, discloses its inherent infirmity. * * * But the province of the jury to pass on the facts *must not be invaded and however improbable the testimony of the witness who testifies to a fact, not in itself impossible, may appear in the ordinary course of events* its credibility is for the jury."

■ The fallacy of defendant's contention is that the testimony of his witnesses as to the blood and hair on the rim of the outer rear wheel is not conceded to be factually correct. Consequently, it was to be evaluated and accepted or rejected by the jury as the jury should determine the truth to be. As was recently said in the case of Caffey v. St. Louis-San Francisco Ry. Co., Mo.App., 292 S.W.2d 611, 615: "Obviously when the physical facts themselves are in dispute or not conceded, estimates and positions based on oral testimony cannot be accepted to exclude plaintiff's cause of action because contrary to natural laws. Young v. Missouri-Kansas-Texas R. Co., Mo.Sup., 100 S.W.2d 929. It requires an extraordinary case for the court to disregard sworn testimony as manifestly improper and untrue, and such testimony is rejected only when the conclusion is so clear and indisputable as to leave no room in the reasonable mind for the entertainment of any other conclusion. The courts are reluctant to draw arbitrary conclusions (see Hardin v. Illinois Central R. Co., 334 Mo. 1169, 70 S.W.2d 1075, 1079), even though it appears from the record that the preponderance of the evidence is greatly in favor of such conclusion. Scott v. Kurn, 343 Mo. 1210, 126 S.W.2d 185, 186."

We hold that a submissible case of humanitarian negligence was made. See Pulley v. Scott, 362 Mo. 1217, 247 S.W.2d 767; Nelson v. O'Leary, Mo.Sup., 291 S.W.2d 142.

■ Defendant's next contention is that the court erred in permitting Mrs. Puckett to testify that the vehicles were "close together" as defendant's truck passed the lumber truck. At the instance of defendant, the jury was directed that a verdict could not be returned for plaintiff unless the jury found and believed from the evidence that "immediately prior to his injury, plaintiff was standing still, in close proximity to and facing" the lumber truck and that defendant's truck struck plaintiff "while plaintiff was so standing * * *." The verdict makes it clear that while the jury believed Mrs. Puckett's testimony that *plaintiff was standing by the truck when* he was struck, it gave no credence to her estimates (conclusions) of which defendant complains. Her testimony in the respects above stated, therefore, was not prejudicial.

■■■ ■ Defendant's next contention is that the trial court prejudicially erred in permitting Dr. Duncan to testify that at the time the police officers said they took a statement from plaintiff he was "not mentally competent" to understandingly make such a statement, citing Henson v. Kansas City, 277 Mo. 443, 454–455, 210 S.W. 13, 16–17. That case was expressly disapproved in Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122, 129 et seq., in which this court said: "While, as noted, the Henson case has not been overruled, the reasons there given for the impropriety of the question have been rendered invalid by subsequent decisions. An expert opinion expressed by one properly qualified and based upon sufficient means of knowledge is evidence. Scanlon v. Kansas City, 325 Mo. 125, 149, 28 S.W. 2d 84, 95 [13, 14]. The *province* of the jury is to hear all the evidence including opinion evidence, to weigh it all, and to decide the issues. Thus an opinion (evidence) cannot 'invade the *province* of a jury,' and this, even though the opinion is upon the very issue to be decided. An objection that an expert opinion invades the province of the jury is not a valid one. Cole v. Uhlmann Grain Co., 340 Mo. 277, 297, 100 S.W.2d 311, 322 [1st col.]. Expert medical opinions are often admissible upon 'vital issues' in a case. For example, on questions of causation and permanency of injuries." See also Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 668, 55 A.L.R.2d 1022. The contention must be overruled.

■■■ Defendant has also assigned error in the admission of the portion of the hospital record reciting, "Car accident this A.M., unable to get detailed history in A.M." In his objection made at the trial, defendant said that "this statement [was made] by Frank O. O'Connell, who was evidently an intern * * *" and, in argument here, defendant contends that O'Connell "evidently [was] not a 'full-fledged doctor.'"

In Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 667, 55 A.L. R.2d 1022, it was said: "It would seem that the following parts of a duly authenticated and qualified hospital record should be admissible, unless subject to specific objections such as irrelevancy, inadequate sources of information, as being self-serving, as going beyond the bounds of legitimate expert opinion, or on similar substantive grounds: the physical examination findings, the patient's symptoms and complaints, treatment and progress records, diagnoses by those qualified to make them, the results of analyses and laboratory tests, X-rays, the behavior of the patient, and those parts of the patient's history inherently necessary (or at least helpful) to the observation, diagnosis and treatment of the patient. Melton v. St. Louis Public Service Co., 363 Mo. 474, 251 S.W. 2d 663, re history. The matters here noted do not purport to be exclusive." We do not know whether Frank O'Connell was a "full-fledged doctor." But Dr. Duncan's qualifications are not questioned, and his testimony leaves little, if any, doubt of the true meaning of the entry. Even if O'Connell was not a "full-fledged doctor", the entry is in complete accord with the testimony of Dr. Duncan. Its admission could not have been prejudicial. The contention is overruled.

■■■ And, finally, defendant contends that the trial court prejudicially erred in refusing him a new trial because of the failure of juror Iretta Harrington truthfully to answer material questions on voir dire examination. On voir dire, plaintiff's counsel asked if any members of the panel, or their respective families, had been sued in an action for personal injuries, whereupon Mrs. Harrington stated that her husband "has been sued, him and the railroad and the insurance company has all been sued together by two guys"; that her "husband was driving a station wagon that the train hit"; that it (the suit) "is on file now somewhere, it has been two

years since it happened"; that "his insurance company is representing him." Mrs. Harrington remained silent when asked if any member of her family had filed an action against anyone else for personal injuries.

Following the trial, one of counsel for defendant filed an affidavit in support of the foregoing assignment in which he stated that C. A. Harrington, the juror's husband, had a suit pending against a named railroad in the Circuit Court of Jackson County for personal injuries allegedly sustained in 1954 in a collision of his automobile with a train, in which he sought $27,500 damages; and that the files of a justice of the peace court in Jackson County revealed that a named doctor had sued the juror and her husband in 1940, in which suit the juror had filed a counterclaim for $5,000 for injuries alleged to arise out of the doctor's malpractice, upon which counterclaim judgment was rendered against the juror. A counteraffidavit of the juror stated that at the time she answered the questions propounded to her she "thought that her husband had a claim pending in the same case which was filed by the passengers in his station wagon; that she did not know that her husband had an independent action against the railroad; that at the time of being questioned she disclosed all of the information she knew of at that time; that she knew some insurance lawyers were representing her husband and assumed that they were also taking care of his action for personal injuries all arising out of the same case * * *"; that she had forgotten about her malpractice claim against Dr. ———— in 1940; and that she had no intention to conceal any fact and that she was in no manner prejudiced in the instant case by either of the aforesaid suits.

Defendant has cited and stressed the cases of Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, 462–464, and Girratono v. Kansas City Public Service Co., Mo.Sup., 272 S.W. 2d 278, 281. In the Piehler case, this court found from the facts set forth in the opinion that the "plain and only reasonable inference from this record is that juror Prince intentionally concealed the fact * * * that in 1943 and 1944 he had a claim against the appellant." In the Girratono case, this court sustained the action of the trial court in granting a new trial where the trial court had found that a venireman had intentionally failed to disclose on voir dire examination that his minor son had a pending suit for personal injuries.

We are unwilling to say in the instant case that the trial court abused its discretion in denying defendant's contention that the juror had not in good faith stated what she believed to be the facts in connection with her husband's suit and that she had forgotten the counterclaim for malpractice in the suit brought by the doctor against her and her husband. So we, in substance, say, as was said in Barb v. Farmers Insurance Exchange, Mo.Sup., 281 S.W.2d 297, 302: "But here the trial court was justified in believing there was no intentional concealment, misrepresentation or deception and prejudice on the part of the two veniremen-jurors. We hold the trial court's action in overruling the motion was within the exercise of its sound discretionary power. In the Piehler case, cited by defendant-appellant Exchange, the only reasonable inference from the record was that the named juror had intentionally concealed the fact that he had in 1943 and 1944 a claim against the defendant in that case. And in the case of Girratono v. Kansas City Public Service Co., Mo.Sup., 272 S.W.2d 278, also cited by defendant-appellant Exchange, the trial court sustained defendant's motion for a new trial. The evidence in that case justified the conclusion that the named juror intentionally withheld information concerning two prior actions for damages."

The judgment of the trial court is affirmed.

All concur.