RUFUS A. HERRING, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

### St. Louis Court of Appeals, May 16, 1899.

1. **Physical Injuries:** RAILROAD: DEMURRER TO THE EVIDENCE: PRACTICE, TRIAL. A case will not be taken away from the jury upon a plea of contributory negligence, unless the undisputed facts can give rise to but one legitimate inference; i. e., that the injury complained of was the fault of the plaintiff, or unless the testimony essential to the plaintiff's case is disproved by the undisputed existence of inerrant physical facts.

2. ——: ——: ——: PRACTICE, TRIAL: JUROR. The rule in this state is, that no juror will be permitted to impeach his verdict, either directly by his affidavit or evidence, or indirectly by the affidavit of others, as to statements made to them by the juror after the verdict was rendered.

3. **Section 2608, Revised Statutes 1899, Construed.** It would be absurd to hold that an engine eighty rods away should begin and continue to ring its bell, while one only seventy-nine rods from the crossing would be permitted to speed over that distance in utter disregard of the precaution to life and property, which it was the purpose of the statute to afford.

*Appeal from the Audrain Circuit Court.*—HON. ELLIOTT M. HUGHES, Judge.

AFFIRMED.

P. H. CULLEN and W. A. EDMONSTON for respondent.

There is no evidence that the jury were guilty of misconduct. A juror can not impeach his verdict by affidavit or

otherwise. Easley v. Railroad, 113 Mo. 237; State v. Rush, 95 Mo. 199; State v. McNamara, 100 Mo. 100. If the jury were guilty of misconduct the appellant should in some way show when they were apprised of the fact. For all that appears in this record the appellant may have had full knowledge of this misconduct before motion for new trial. Easley v. Railroad, 113 Mo. 237. In all cases of this class the question at last is, admitting the negligence of the railroad company, has the claimant for damages, notwithstanding, been himself negligent in the matter, conducted himself as an ordinarily prudent person would under similar circumstances. This primarily is a question for the jury and the court can not take that issue from the jury, except in cases where men of ordinary judgment would not differ. Frazier v. Wabash, 75 Mo. App. 256; Russell v. Receivers, 70 Mo. App. 88; Kennayde v. Railroad, 45 Mo. 255; Welsh v. Railroad, 72 Mo. 451; Johnson v. Railroad, 77 Mo. 546; Petty v. Railroad, 88 Mo. 306; Kelly v. Railroad, 88 Mo. 534.

GEO. S. GROVES for appellant.

The demurrer to the evidence should have been sustained, for the reason that the contributory negligence of the plaintiff was so great as to bar his recovery. Payne v. Railroad, 136 Mo. 562. The misconduct of the jury was such as to entitle the defendant to a new trial. Baylies on New Trials, p. 542, and cases cited; Bowler v. Washington, 62 Me. 302; R. S. Maine, sec. 90, p. 706; State v. Hartman, 46 Wis. 248.

BOND, J.—This action is for personal injuries to plaintiff and the destruction of his wagon and killing of one of his team of horses caused by a collision with the engine of one of defendant's trains at a street crossing in Mexico, Missouri. The defendant pleaded contributory negligence on the part of the plaintiff as the cause of the accident. The jury returned a

verdict for plaintiff for $635. From a judgment thereon defendant appealed.

Appellant insists that the court erred in refusing to direct a verdict in its favor. To pass on this question it becomes necessary to determine what is the legal effect of the evidence adduced in support of plaintiff's case. The place of the accident was the crossing of Jefferson street, which runs north and south, and the tracks of the defendant's railway, which runs east and west, in the city of Mexico. The time was between 6 and 7 p. m., August 4, 1898. The occasion is thus described in plaintiff's testimony: "I am the plaintiff in this case; live six miles southwest of town; have lived there eighteen years; during that time have had occasion to visit Mexico once a week on an average; was the owner of the horses and team that I was driving on the evening of August 4; one horse's leg was cut off and I turned it over to the company and they shot him." (Then follows description and statement of the value of the team, harness, wagon, and nature of the injuries suffered by plaintiff in consequence of the collision with defendant's engine.) "The day I came in town and got hurt was the 4th day of August; when I got in it wasn't six o'clock; I drove up as far as Mr. Hisey's livery stable and had a load of wood on my wagon, and met a colored man, and he said if I would take the wood to Mr. Buckner's he would buy it; Mr. Buckner's is south of the crossing; I went around and went back and unloaded my wood, and by this time it was after six o'clock; I do not know what the custom of the railroad is about keeping a watchman at that crossing; I supposed he was there day and night; he was always there, and I supposed he was on the inside, if he wasn't on the outside; I do not know anything about the hours in which he stayed there; when I came in with the wood he was there, and came up to the stable; as I went back I looked for him, looked up and down the track, and was driving very slow; when I went back to Mr. Buckner's I unloaded the wood; after doing that I went north, going

back toward the public square; as I approached Jefferson street crossing I was on the hounds of the wagon and my feet hanging over to the east; as I went to the crossing I looked as far as I could see; I could see down well enough, and everything seemed quiet, and I just drove on; I listened and never heard anything, and didn't see anything when I looked; I was about twenty feet from the track when I made this observation, further back I was looking, of course; I was looking to see if the watchman was there, I supposed he was in his cabin; I didn't see him, but I had an idea he was; there was no bell ringing; I never seen any smoke; after making this observation I crossed over the tracks. Q. How near were you to the crossing when you observed the train? A. I was pretty near on it; I guess on it, and I jerked up the lines as quick as I could, you know; I thought I could jerk them back, but it knocked me off just that quick. It was in this fall that I received the injuries spoken of."

CROSS-EXAMINATION.

"I was going along the track going north; I came very slow; I didn't stop exactly still as I came on down north; I was looking all along from the coal shed, and I kept looking as I drove onto the track, both east and west; I looked until I was satisfied. Q. Then you drove on the track and the train was on you before you saw it? A. Yes, the train hit upon me."

Being recalled plaintiff further testified: "I was driving just the running gear of a wagon; the wagon was not making any unusual noise—nothing special; if I remember, I was a little west of the center of the road, near the west side; I looked up and down, watching for the watchman, as I approached the crossing; the team was going a little out of a walk—a little jog. Q. Where were you when you first saw the engine? A. I could not tell you exactly the number of feet,

but it was so close I could not get out of the way—I could not do anything. I looked all the way back from the coal shed; beyond the coal shed I was looking down. Q. How far up the track was the engine when you first saw it? A. It was right at me—it was so close. I jerked my team up— I thought I could jerk it back, but it struck my team and knocked me off on the ground; I stopped them and held on to them at last; I felt the pressure of the lines going from me when I fell."

Jefferson street at the scene of the accident is overlaid with four railroad tracks. The southerly two are about six feet apart and belong to defendant. The collision happened on the second of these tracks as the plaintiff approached from the south. The stock pens and oil tanks of defendant are west of Jefferson street and run parallel with its tracks, beginning on the west side of Jefferson street at a point thirteen and two-thirds feet from the south line of defendant's first track. As to the effect of these structures upon the vision of persons approaching the crossing, plaintiff adduced the following testimony:

Witness Dicus: "I made observations coming down Jefferson street as to whether a person coming down that street, going north, could see along the track west; going north of course these stock pens obstruct the view to a great extent of the railroad track, but a person if he would go right up to the track or near the track, you would have a pretty good view west, but you would have to come up quite close—I suppose within ten or fifteen feet; could not see the railroad well before passing the stock pens; from Jefferson street crossing up to and beyond the oil tanks it is in the neighborhood of seventy or seventy-five yards."

Witness Price Guthrie: "Going down Jefferson street to the railroad you have to get right down to the railroad before you can see anything west of the stock pens; that is, not over ten or twenty feet; there is no point at which you can see

south of that point; that is, about ten feet south of the railroad where the railroad can be seen looking west."

Witness John W. Howell: "That he made observations on the morning of the day he was called as a witness." He said: "The northeast corner of the stock pens is 13 feet and 8 inches south of the first track. I walked down Jefferson street from the south this morning. You have to get within 15 feet of the track to see the track west of the crossing. Immediately north of the northeast corner of the stock pens is one pole and a telegraph pole. I expect Jefferson street is the most traveled street in town."

Three other witnesses for plaintiff corroborated the foregoing testimony. It is conceded by appellant "that there were conflicting statements from eye witnesses as to whether the engine bell was ringing at that time or prior thereto." Plaintiff gave evidence that a flagman was kept by defendant at the crossing in question until 7 o'clock in the evening, whose duty it was to signal travelers with a red flag when a train was approaching. Defendant's flagman testified that he was not at his post because he was not required to be there longer than 6 o'clock p. m. of each day. Defendant also gave evidence tending to show that plaintiff might have observed a train which was approaching the crossing at a much greater distance therefrom than the point to which the witness for plaintiff testified it would be necessary to reach before a train from the west, approaching the crossing, could be seen. Taking the testimony favorable to plaintiff's theory to be true, as must be done, in passing upon a demurrer to the evidence, it appears that plaintiff approached a crossing where he had a right to expect to find a man stationed, whose duty it was to warn all comers of the danger of passing trains; that the plaintiff was driving in a jog, just above a walk; that his view was obstructed on the west by intervening structures until he reached a point within twenty feet of the track upon which an engine drawing a train was backing from that direction without either

ringing the bell or signaling its approach; that when he got within visual range, having been before that time unable to see or hear any signs of an approaching train, and having been also before that time watching for the flagman and expecting to see him at his stand between the tracks, he suddenly saw the engine at a moment when, on account of the length of his wagon and the attached team, their heads had nearly reached the second track of defendant over which the engine was backing toward the crossing; that in catching sight of the train and the imminent danger of a collision with the heads of his horses, he instantly endeavored to jerk them back, was unable to do so, and hence suffered the injuries sued for. Taking this view of the evidence it can not be said that plaintiff's negligence was the cause of the injury to him and his property in the transaction under review. Of course, the rule has been repeatedly announced that a case will not be taken away from the jury upon a plea of contributory negligence, unless the undisputed facts can give rise to but one legitimate inference, i. e., that the injury complained of was the fault of the plaintiff, or unless the testimony essential to the plaintiff's case is disproved by the undisputed existence of inerrant physical facts. The record in this cause does not reveal the presence of physical facts which disprove testimony warranting the submission of the case to the jury. Hence the trial court did not err in overruling the demurrer of defendant to the evidence, either at the close of plaintiff's case, or at the conclusion of the entire testimony.

CASE taken from the jury, when?

It is next insisted that the court erred in refusing to permit defendant to show by one of the jurors that during a recess in the trial he and another juror went to the place of the accident and viewed the scene to inform themselves upon the issues on trial. While, if true, such conduct on the part of the jurors was improper, there was no error in excluding proof thereof by the testimony of one of the jurors. The rule in

this state is, that no juror will be permitted to impeach his verdict, either directly by his affidavit or evidence, or indirectly by the affidavit of others, as to statements made to them by the juror after the verdict was rendered. State v. Rush, 95 Mo. loc. cit. 205; Easley v. Railroad, 113 Mo. loc. cit. 247. In the latter case this rule was applied to the exact point under consideration, and it was held that an examination of the *locus in quo* of an accident for which suit was brought, by one of the jurors during the progress of the trial, could not be shown by the affidavits of persons to whom he had admitted the fact that he had made a personal examination of the spot in question, the court putting its decision on the ground that such a showing would violate the rule prohibiting a juror from directly or indirectly impeaching his verdict.

Lastly appellant complains of an instruction for plaintiff in which the court told the jury that if they believed the injuries to plaintiff and his property were caused solely by defendant's neglect to ring the bell of its engine at a distance of eighty rods and thereafter until it reached said crossing, they should find for plaintiff. It is argued against this instruction that the evidence fails to show that the engine, which was doing switch work, was at any time as far as eighty rods distant from the crossing, and hence the jury might have been misled in deeming it the duty of the defendant to ring its bell at an impossible distance. The purpose of the statute is twofold. It requires, first, a continuous ringing of the bell of the locomotive engine until it shall have crossed any traveled public road or street; secondly, it requires this to be begun when the engine is distant as far as eighty rods from the crossing. R. S. 1889, sec. 2608. It does not, however, excuse the duty of a continuous ringing of the bell because the engine happens to be less than eighty rods from the crossing it is about to traverse. For it would be absurd to hold that an engine eighty rods away should begin and continue to ring its bell, while one only seventy-nine rods from the crossing would be permitted

to speed over that distance in utter disregard of the precaution to life and property, which it was the purpose of the statute to afford. Conceding that the proof was not clear that the defendant engine was eighty rods from the crossing, we do not think the jury could have been misled by the use of the statutory terms in the court's instruction, but that they took the common sense view that the question submitted to them was, whether or not the bell was rung as the engine approached the crossing, and not whether or not the ringing began when the engine was eighty rods distant from the crossing. The judgment in this case is affirmed. All concur.