QUINN C. EUBANK v. KANSAS CITY TERMINAL RAILWAY COMPANY, a Corporation, Appellant.—142 S. W. (2d) 19.

Division Two, July 3, 1940.*

---

*NOTE: Opinion filed at September Term, 1939, May 4, 1940; appellant's motion for rehearing or to transfer to Court en Banc filed; motion overruled at May Term, 1940, July 3, 1940.

*S. W. Sawyer, John H. Lathrop, John N. Monteith* and *James F. Walsh* for Kansas City Terminal Railway Company.

438

*Hogsett, Murray, Trippe, Depping & Houts* for respondent.

COOLEY, C.—Action for damages for personal injuries. Verdict for plaintiff for $15,000, reduced by *remittitur* required by the court

to $9,000, and judgment entered for latter amount. Defendant appeals. The case was submitted on primary negligence and negligence under the Kansas "last clear chance" doctrine, the accident having occurred in Kansas and being governed by the substantive law of that State. Questions of the sufficiency of the evidence to authorize submission and as to certain instructions are involved in this appeal. No question as to excessiveness of the judgment is raised. ■ The insistence that plaintiff's demurrer to the evidence should have been sustained will require a somewhat detailed statement of the facts. We shall try to state them, having in mind the established rule that in passing on a demurrer to the evidence the plaintiff's evidence is to be taken as true and countervailing evidence is to be disregarded. The plaintiff's evidence tends to show the following:

The accident occurred on Southwest Boulevard, Rosedale, Kansas, at about 9 P. M., September 26th, 1936. Plaintiff was operating a streetcar, as motorman, going east on Southwest Boulevard, an east and west street. Defendant, through its employees and agents, was operating an engine, with five cars behind it, on the tracks of the railroad, referred to in the record as the Frisco. [No question is raised as to the right of defendant to operate on the "Frisco" tracks.] The tracks, at that intersection, run generally from northeast to southwest, crossing Southwest Boulevard at an angle. For convenience and brevity we shall refer to the course of the railroad tracks as north and south, but keeping in mind that, for certain distances to be mentioned, the course is in fact diagonal across the street.

The engine that struck plaintiff's streetcar was going south on the west (southbound) of the two Frisco tracks that crossed Southwest Boulevard at that intersection. Plaintiff, as stated, was going east, and was on the south, or eastbound, track of the double track streetcar line. He stopped about twelve or fourteen feet from the west railroad track. A Kansas statute required him, in such circumstances, to stop not less than ten nor more than twenty feet from the crossing. He stopped within that required distance. [The statute does not say *how long* he should remain stopped.] Looking northward he saw the engine (which later struck him) and which appeared to him then to be standing still. (Of this, more anon.) He started forward and was caught and struck on the crossing.

Measured directly across Southwest Boulevard the pavement was 44 feet and 4 inches wide. Measured along the railroad track (diagonally) the distance from curb to curb was 67 feet and six inches. About 311 feet north of the north curb of the boulevard there was a switch. The Frisco maintained a tower at the southwest corner of the intersection, with a tower man. and on each side of its tracks a railroad crossing sign with electric lighting equipment, referred to as "flasher lights," designed to flash automatically when a train was on the Frisco tracks within a certain circuit, and also

designed and equipped to be controlled and turned on and off by the tower man. The east flasher light was on the north side of the boulevard about twenty-three feet east of the east Frisco track. Its lights were hooded and designed to show only toward the east and to stop west bound traffic. It also had a bell designed to ring when the lights were flashing. The west flasher light was on the south side of the boulevard, 25 feet and 4 inches west of the west rail of the west Frisco track. Its lights were similarly hooded and designed to show to the west only and to stop eastbound traffic. When plaintiff stopped, pursuant to statutory command, he was beyond—east of—that flasher light and *its* light, if it was burning, afforded him little or no aid in seeing eastward and northward up the railroad track. The night was dark and visibility poor, although there were street lights on the boulevard which afforded some illumination of the crossing.

Plaintiff was familiar with the crossing. He testified that as he slowed down and stopped west of the railroad tracks the flasher lights were not in operation and the crossing bell above mentioned was not ringing; that when he stopped he looked to the north up the railroad tracks and saw defendant's engine "standing" north of the boulevard at about the property line; that it was dark north of the boulevard, but he could see an object such as an engine without headlights 25 or 30 feet beyond the property line; that there was no headlight burning on the engine and he saw no light in the cab; that no bell or whistle was sounded from the engine; that, seeing the engine standing, as it appeared to him, he started forward and when the front of his car was two or three feet from the west rail of the west Frisco track he saw defendant's engine start toward him into the boulevard and applied his emergency brake and rang his bell; that the streetcar "stopped or practically stopped" with the front end over the east rail of the west railroad track, when the engine struck it. There was evidence pro and con as to whether the engine struck the streetcar or the streetcar the engine, but the evidence was ample to justify a finding that the engine struck the streetcar, crashing through its front vestibule and injuring plaintiff.

Defendant's engineer, Foster, testifying for defendant, admitted that he saw plaintiff's streetcar approaching from the west when it was about 75 feet west of the west railroad track and as he, Foster, was "coasting" toward the crossing, his engine not working steam or making noise. He said the streetcar then appeared to be slowing down, as if for a stop, and he did not again look that way, supposing the streetcar would stop, but looked back up the track (northeastward) for a signal from his switchman, Beades, who had thrown the switch above mentioned, 311 feet north of the boulevard. It should be stated that according to defendant's evidence the intended movement of the train was to go south past the switch and then back up on another track and Beades was to throw the switch for the return—northward—

movement. Only two men, the engineer and fireman, were on the engine, and the fireman, from his position on the left side of the cab, could not see to the west on the boulevard, leaving the engineer as the only person with control of the engine who could see the approaching streetcar.

Defendant contends and offered evidence tending to prove that the engine did not stop before entering the boulevard but was steadily moving forward and that as plaintiff saw it or, according to his testimony, could have seen it 25 or 30 feet north of the boulevard, he knew it was moving forward when he started across the tracks after having stopped, and that he was guilty of contributory negligence in so starting across or else in not accelerating his speed and beating the engine across, thus barring recovery on the primary negligence theory. Since this contention presents a sharply contested issue we deem it appropriate to set out in some detail the plaintiff's testimony on this point. He testified on direct examination that when he stopped he saw the engine "about the property line . . . just north of the sidewalk" on the north side of the boulevard.

"Q. What was it doing there apparently when you saw it there? A. Stopped, standing.

"Q. Was it letting off any smoke or puffing, or making any noise at all? A. No, sir. . . .

"Q. Was there any sound or any indication whatever that that engine was coming over and across that boulevard? A. Not till after I had started.

"Q. Mr. Eubanks, when you came up to this crossing and stopped your streetcar, I want to ask you again, when you came up there and stopped, as you said, within twelve or fourteen feet of the tracks, did you see this switch engine? A. I did.

"Q. All right. Now, where was it at that time? A. Just north of the sidewalk.

"Q. And what was it doing there? A. *Standing, stopped.* . .

"Q. Well, what was it doing there? Tell whether or not it was throwing off any steam. A. There was no steam.

"Q. Tell whether or not it was puffing. A. It was not puffing.

"Q. Tell whether or not it had any headlights on it. A. There wasn't any burning."

On cross-examination plaintiff testified:

"Q. Now, Mr. Eubanks, you saw that engine moving right at that time, didn't you? A. No, sir.

"Q. And you didn't know whether it was moving or not? A. It appeared to be stopped.

"Q. Well, Mr. Eubanks, when you testified here at the last trial, I am going to ask you if these questions weren't asked you and if you didn't make these answers (reading): 'Q. And how long do you say you stopped, Mr. Eubanks? A. Not more than one or two

seconds, just long enough— Q. Not more than one or two seconds. And you then looked down to the northeast, didn't you? A. I did. Q. And what did you see down there? A. I saw the engine. Q. You saw the engine? A. Saw the switch engine. Q. Now, the switch engine was headed out toward the boulevard, wasn't it? A. It was. Q. And could you see that engine was moving right then, Mr. Eubanks? A. I could not, no, sir. Q. If you had looked a little harder, you could, couldn't you? A. I don't believe so. I believe it was stopped when I saw it. Q. Well, you don't know whether it was stopped or not, do you? A. I couldn't swear positively, if it was moving it was awfully slow; no noise whatever.' Those questions were asked you?  . . .

"Q. (By Mr. LATHROP) Those questions were asked you and you made those answers? A. They were, yes, sir.

"Q. And you can't swear now that that engine wasn't moving, can you, Mr. Eubanks? A. I couldn't swear it was positively stopped.

"Q. What is it? A. It appeared to be standing.

"Q. But you can't swear whether it was moving or not, isn't that right? A. That is right.

"Q. And as a matter of fact, you looked at it right along there, didn't you, kept your eye on it all the time? A. Yes, sir.

"Q. Why did you do that? A. Customary.

"Q. From the time you first saw it there, now, at the north side of that crossing, you kept your eye on it every moment, didn't you? A. Yes, sir."

As concerns the issue of primary negligence it does not seem to be seriously urged that the evidence did not justify submission of the question of whether or not defendant was negligent. We think the evidence did justify submission of that question, but it is needless to discuss it in detail. Appellant's contention on this point is that under the evidence plaintiff was guilty, as matter of law, of contributory negligence, barring recovery for primary negligence. It cites Kansas Supreme Court decisions deciding crossing cases, mostly in the country, and where the injured party, by looking, could have seen an approaching train and failed to look, or where the traveler's view was obstructed so that he could not see from where he looked and negligently failed to look when he could have seen, or, if necessary in the exercise of ordinary care, failed to stop and assure himself that it was safe to cross. Illustrative is McCune v. Thompson, 147 Kan. 57, 75 Pac. (2d) 294, wherein it is said (147 Kan. l. c. 59),—"A person about to cross a railway track must first assure himself that no train is approaching and that it is safe to cross. If he attempts to cross without first making sure that he can safely do so, he is guilty of negligence, and he will not be permitted to penalize the railway company if an accident occurs." That was a "crossing"

case, such as has frequently arisen in Kansas and in this State. Other Kansas cases cited reflect the same thought. The general principle of law announced in·such cases is substantially the same as the rule recognized in this State. It may be conceded that, generally speaking, a railroad track is of itself a signal of possible danger to one about to cross it. But, as said in Brim v. Atchison, T. & S. F. Ry. Co., 136 Kan. 159, 165, "It cannot be laid down dogmatically that, if a person gets injured or killed at a railway crossing in the open country, such mishap or fatality could in no event happen but for his own contributory negligence, *and, of course every crossing-accident case must be decided upon its own peculiar facts.*" (Italics ours.)

In Moses v. Mo. Pac. Railroad Co., 138 Kan. 347, the plaintiff was struck by a train on the defendant's railroad upon a crossing. It was at night. The train gave no signal or warning that it was about to back over the crossing, and there were no lights on the end of the string of cars being backed over the crossing. The court held that the plaintiff had no cause to anticipate that a train would be pushed or pulled over the crossing in the nighttime without lights or warning of some kind, and that the question of contributory negligence on his part was for the jury.

In St. L. & S. F. Ry. Co. v. Dawson, 64 Kan. 99, a woman, walking on the sidewalk in the city of Pittsburg, Kansas, was struck and injured by a railroad engine. The engine was standing (very near the sidewalk line) when she started to cross in front of it. It was "steamed up" and "ready to go" but was apparently not moving when she started to cross in front of it. The engine started without warning and caught her. It was claimed that she was guilty of contributory negligence as matter of law. That contention was denied. Paragraph 2 of the syllabus (64 Kan. 99) we think sufficiently reflects the opinion of the court. It reads:

"A traveler upon a public city street, passing in front of an engine fired up and manned, standing without the bounds of the highway, but so near it that from the cab windows the street and objects within it can be plainly seen, has a right to assume that the engineer will not, without warning, start his locomotive and run over her upon the street before she can, while proceeding with haste and in ·the exercise of ordinary care and caution, cross the tracks upon which the engine is standing when she makes the attempt so to do."

In the body of the opinion the court distinguished the case from "the ordinary crossing cases in town or country," and reviewed a number of authorities sustaining its decision that the plaintiff could not be declared, as matter of law, guilty of contributory negligence. Atchison, T. & S. F. Ry. Co. v. Wilkie, 77 Kan. 791, and Whitehead v. M., K. & T. Ry. Co., 83 Kan. 221, are to the same general effect. [See also Fusili v. Mo. Pac. Ry. Co., 45 Mo. App. 535, 539-540.]

In the last three above cited Kansas cases the engine was standing just before the injured traveller attempted to cross in front of it and started up without warning. In the instant case it is a contested question whether the engine was standing or moving slowly forward when plaintiff started to cross the tracks. Appellant asserts that according to plaintiff's own testimony he did not know whether the engine was moving or not. It is true he did finally say that he ''couldn't swear it was postively stopped.'' But the sum and substance of his testimony was to the effect that it appeared to him to be standing and in his judgment was standing. In Losey v. A., T. & S. F. Ry. Co., 84 Kan. 224, 231, we read:

''If a witness employs such an expression as 'I think' or 'I believe,' meaning that his uncertainty results either from lack of close observation of the fact originally or from want of clear recollection regarding it, his testimony is admissible, and the qualification goes to his weight; but if he means that he did not observe the fact at all, and so has no personal information regarding it, and has acquired his opinion from other sources, his testimony is incompetent.''

See also, on this proposition Jockers v. Borgman, 29 Kan. 109, 113; Alabama City, etc, Ry. Co. v. Bullard, 157 Ala. 618, 623, that the statement of a witness, ''looked like he fell powerful hard and got hurt'' was ''but a statement of a fact, in the judgment of the witness, from what he saw'' and was competent evidence. In Binsbacher v. St. L. Transit Co., 108 Mo. App. 1, 3, 82 S. W. 546, it was held that the statement of a witness ''sounded like a collision . . . to me; that was my impression of it,'' was competent and seemed to be treated as substantial evidence. In Hill v. Harvey (Mo.), 201 S. W. 535, 537 [4] a witness was permitted to state, after saying he did not know just how far the respondent was dragged, ''it must have been some 20 or 25 feet.'' The court said:

''The witness could not have given the exact distance when he had never measured it. All he could do under the circumstances was to give his best judgment as to the distance the respondent was dragged. That was what he did in this case, and all the authorities hold such evidence is proper.''

And to the effect that expressions such as ''I think,'' ''I believe,'' ''my impression is,'' may be treated as competent evidence, if based upon the witness' recollection of observed facts, (not a mere opinion or conclusion), see annotations to Abbot v. Church, 4 A. L. R. 975, annotation p. 979 et seq.

We are inclined to think that upon *plaintiff's* testimony the jury could find that the engine had stopped north of the boulevard and was standing when plaintiff started forward to cross the railroad track, notwithstanding the fact that he ultimately admitted that he ''could not swear'' that it had actually stopped. That statement may have been but the cautious statement of a conscientious witness

who did not want to ''swear'' to something he did not absolutely know. [We are not unmindful that defendant's witnesses and some of plaintiff's testified to the effect that the engine did not stop north of the boulevard, but we are considering the question of a demurrer to the evidence.] Even if we are wrong in intimating that plaintiff's testimony permitted a finding that the engine had stopped and was standing when plaintiff started to cross, there was evidence from which the jury could find that plaintiff believed (reasonably) that it had stopped or was stopping, and that it would not proceed across the crossing without warning or indication of intent so to do. We are considering now the question of plaintiff's alleged contributory negligence. He was operating a streetcar, which had its own schedule to make. He stopped, as the law required, before attempting to cross the railroad track. He saw the engine—yes—but it appeared to him then to be standing. According to his testimony—and that of several corroborating witnesses—it had no headlight burning. If it was moving at all it was moving very slowly, ''coasting,'' not working steam nor making any noise. It gave no warning, by bell or whistle or otherwise, of an intent to cross the intersection. The place in question was a public and much used street. Plaintiff may reasonably have assumed that if those in charge of the engine intended to come on across the intersection they would give some indication of that purpose, and the duty to give such signals rested upon the defendant in the circumstances, regardless of whether or not required by statute or ordinance. [See A., T. & S. F. Ry. Co. v. Wilkie, supra.] We think the question of plaintiff's alleged contributory negligence was for the jury.

█ It is urged that plaintiff made no case to go to the jury on the ''last clear chance'' theory as recognized and enforced in Kansas. In Bollinger v. St. L.-S. F. Ry. Co., 334 Mo. 720, 67 S. W. (2d) 985, this court en banc considered the Kansas ''last chance'' doctrine and reviewed a number of Kansas decisions elucidating that doctrine as applied by the Kansas Court. We said (334 Mo. 720, 67 S. W. (2d) 989):

''The Kansas courts have adopted what may be termed the strict last chance doctrine of recovery as distinguished from the humanitarian rule adopted in this State, each of which allows a plaintiff to recover nothwithstanding his own contributory negligence in going into the peril. The Kansas rule is more limited in its application than the Missouri rule. We had occasion to examine this matter in the recent case of Caylor v. St. Louis-San Francisco Ry. Co., 332 Mo. 851, 59 S. W. (2d) 661, 663, and held that under the law of Kansas a plaintiff's contributory negligence ceases to be a complete defense only when such plaintiff is in helpless peril, that is, in a condition of peril from which he cannot by the exercise of reasonable care extricate himself. So long as the plaintiff has the power to

avert the danger by using reasonable care, it is his duty to do so, and his failure to do so is negligence concurrent with and contributory to that of the defendant and bars recovery. The same idea is expressed in saying that the last chance doctrine begins to be applicable only when plaintiff's contributory negligence is at an end. In a railroad crossing case, the plaintiff's contributory negligence ceases only when he or she has progressed so near to the railroad track that it is practically impossible to avoid a collision by the means at hand. The plaintiff is then in helpless or inextricable peril, is no longer negligent, and previous negligence in going into such position is wiped out, and, if the defendant yet has the ability to avert the collision by due care and the means at hand, and fails to do so, it is liable. This, as we understand it, is the Kansas last chance doctrine. It is not limited, however, to an actual seeing or discovery by defendant of the plaintiff's helpless peril, but includes such peril as defendant could discover by due care and vigilance.''

Also, we said, 334 Mo. l. c. 729, 67 S. W. (2d) l. c. 990:—

''The rule is well stated in Dyerson v. Railroad, 74 Kan. 528, 536, 87 Pac. 680, 683, 7 L. R. A. (N. S.) 132, 11 Ann. Cas. 207, as follows; 'The test is, What wrongful conduct occasioning an injury was in operation at the very moment it occurred or became inevitable? If just before that climax only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone. If however, each had such power and each neglected to use it, then their negligence was concurrent, and neither can recover against the other.' ''

And, concluding the discussion of the law of last clear chance as applied by the Kansas Courts, we said:

''We therefore think that clearly the Kansas doctrine of last clear chance is based on and limited to cases where the plaintiff is in helpless or inextricable peril, though so placed by his own negligence, and the defendant discovers, or ought to discover, him in that condition, and yet has the ability by due care and the means at hand to avoid the injury, but fails to do so.''

On the issue of negligence under the last chance doctrine appellant argues that plaintiff's claimed contributory negligence continued to the moment of collision because, if he had continued going forward when, according to his testimony, he discovered the engine coming into the boulevard, he could have cleared the track before being struck. It is true plaintiff said that he ''might have been going'' eight miles an hour, ''just an estimate''—when, two or three feet from the track, he discovered the engine, at about the north boulevard line, moving toward him and applied his emergency brakes. By nice mathematical calculation it might be determined, after the event, that *if* his estimate of speed was correct and if he had proceeded at that rate or perhaps accelerated his speed, he might have cleared

the track. But we all know that in times of sudden emergency men do not and cannot always exercise the cool and deliberate judgment that keen minds may calculate, after the event, could perhaps, by mathematical precision, have produced a different result. Rules of law must be given a practical and human application. Plaintiff said that when he was two or three feet from the track he discovered the engine entering or about to enter the boulevard, and that he "might have been" (estimating) going eight miles an hour at that moment. But he also testified, giving sort of a word picture of what occurred:

"Q. Was there any sound or any indication whatever that that engine was coming over and across that boulevard? A. Not till after I had started.

"Q. Now, tell us about that. What did you do then? A. I rang my bell and started, fed the control lever to almost full service and I heard the engine start puffing hard, I noticed it was coming my way, I rang my bell with my heel as loud as I could, and applied the emergency brake, and my car was stopped or practically stopped when it was completely over the railroad rails. The engine didn't slow a bit till he hit the vestibule behind where I was standing three, four, five feet.

"Q. Now, let's go back a little. Where was the front of your car approximately? Of course, I know you can't tell us exactly, but approximately where was the front end of your car with reference to those railroad rails at the time when you noticed this engine for the first time, noticed that it was coming out into that boulevard? A. Two or three feet west of the west rail.

"Q. Now, what did you do then, when you saw it was coming out into that boulevard there, what did you then do? A. I rang the bell as loud as I could and applied the emergency brake.

"Q. Why didn't you speed on up, or speed farther forward with your street car? A. *Well, there wasn't a chance in the world to get across. I knew the street car would be hit, if it was hit at all it would hit the solid part and bust it all to pieces, be a worse accident, I thought by slowing, the engineer or switchman, or flagman, whoever was on that side would have a better chance of seeing me and hearing me if I had more of my car west.*" (Italics ours.)

█ Now, if (concerning the "last clear chance" doctrine) the plaintiff's contributory negligence, if any, ceases when he is in a position of imminent peril from which he cannot extricate himself, and he is not thereafter negligent, what does it matter *how* he got into that position? In the instant case say, for argument's sake, that plaintiff was negligent in not going forward across the track. He did not do so, but stopped or practically stopped on the track. Beyond question he was then in peril if the engine kept coming on. Obviously he could not again have put on power and gone forward or backward

out of that position of peril. The engine was coming into the boulevard. There was evidence that it could have been stopped in seven to ten feet. If, then, the engineer could have stopped after he saw or should have seen plaintiff's streetcar on the railroad track in apparently inextricable danger, he should have done so. The question was for the jury.

Appellant contends that even if the plaintiff made a case for the jury his instructions Nos. 1 and 2 were prejudicially erroneous. Instruction No. 1 submitted the last clear chance theory. It is argued that the engineer had a right to assume that the streetcar would stop and was under no duty to keep a further lookout when he started across the intersection; that the instruction did not submit to the jury to find that plaintiff's negligence had ceased; and that it did not require the jury to find that plaintiff could not by the exercise of ordinary care extricate himself from his perilous position. This instruction, after hypothesizing certain facts not seriously disputed, told the jury "and if you further find that defendant's said employees . . . saw or by the exercise of ordinary care could have seen plaintiff . . . in a position of imminent danger and peril of being struck by said engine, and in a position of imminent peril and danger, if so, *from which he could not extricate himself,* if so, all *in time thereafter* (if you so find) by the exercise of ordinary care . . . to have stopped said engine and to have averted the collision . . . and that defendant's said employees negligently (if you so find) failed to stop said engine in time to avert said collision, and that as a *direct result* of said negligence (if any) . . ."—the plaintiff was injured, he could recover, under that instruction (the "last clear chance" theory) "even though you should believe . . . that plaintiff was negligent in *getting into* said position of *imminent and inextricable peril and danger,* as aforesaid." (Italics in above quotation ours.) Under the facts and circumstances of this case we do not think said instruction No. 1 was prejudicially erroneous.

Plaintiff's instruction No. 2 submitted primary negligence. It required the jury to find that (under said instruction) the collision and plaintiff's injuries "were directly caused by negligence of defendant's employees in that they negligently, if so, failed to keep a (reasonably careful) lookout for vehicles and persons about to cross the railroad tracks . . . *and* negligently, if so, failed to warn plaintiff that said engine was going over said crossing, and *if you further find* that at said time and place plaintiff was exercising ordinary care for his own safety . . ." he could recover on the primary negligence theory. (Italics ours.) Appellant says—"We may concede that in ordinary cases it is the duty of operators of an engine in passing over a street or highway to keep a lookout ahead, and in this case they did keep all the lookout that the law requires." But did they? Southwest Boulevard was a much traveled city street,

traversed by a double track streetcar line. The law required the streetcar approaching the intersection to stop before crossing the railroad track, and it did stop. But the law did not say how long it should remain stopped. The streetcar had its own schedule to make. The east flasher light was designed to show only toward the east. The west flasher light was designed to show only toward the west, and plaintiff, when he stopped, pursuant to statutory mandate, had passed that light. Appellant argues that even if its engineer failed to give any warning of his intention to cross the boulevard the plaintiff was sufficiently warned by the flasher lights. It seems to us that it was a question for the jury whether the engineer, in the circumstances shown, should have given a warning of his intention to cross and the instruction in question required the jury to find that he negligently failed so to do. It also required the jury to find that plaintiff "was exercising ordinary care for his own safety." We perceive no prejudicial error in this instruction.

It is contended that the court erred in excluding defendants offer to prove (on cross-examination)—that a witness for plaintiff, one Johnson, had settled with the streetcar company (not the defendant herein)—a claim of his own arising out of the same accident. Defendant argues that such fact was admissible as affecting Johnson's credibility. We have considered this contention but do not deem it of substantial merit.

In our opinion there is no prejudicial error in the record and the judgment should be affirmed. It is so ordered. *Westhues, C.*, concurs; *Bohling, C.*, concurs in result.

PER CURIAM.—The foregoing opinion by COOLEY C., is adopted as the opinion of the court. All the judges concur.

