**C. E. CAFFEY, Plaintiff-Respondent,**

**v.**

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a corporation, Defendant-Appellant.**

**No. 7419.**

Springfield Court of Appeals.

Missouri.

July 6, 1956.

James L. Homire, St. Louis, David Donnelly, Donnelly & Donnelly, Lebanon, for defendant appellant.

Fields & Low, John A. Honssinger, John F. Low, Lebanon, for plaintiff respondent.

RUARK, Judge.

Plaintiff had verdict and judgment because of damage to his pickup truck sustained in a diesel engine-truck collision. After the overruling of proper motions defendant has appealed. Plaintiff pleaded and submitted failure to give the statutory signals by bell or whistle. Defendant pleaded and submitted denial of its negligence and contributory negligence on the part of plaintiff.

The collision occurred in the daytime on a clear and cold December day near the west side of Lebanon where defendant's east-west tracks cross over the old Springfield road, which at that point is a blacktop street extending in a north-south direction and running "sort of upgrade to the crossing." Crossing the street are at least two sets of tracks and immediately, "a few feet," to the east is the entrance of another switch track leading off in that direction. The width of the street at the crossing is 20-25 feet by plaintiff's estimate and 16 feet by estimate of defendant's diesel engineer. No exact measurements were furnished. Some 70 or 75 feet south of the crossing and on the west side of the street is situate the Dampier garage building. A traveler approaching from the south, after passing the garage, has a clear and unobstructed view of the railroad tracks to the west of the crossing for a distance of at least a quarter of a mile. The rails approaching to and over the crossing are laid

on a 1.20 grade, but in which direction the slope is not shown. Plaintiff, a farmer aged 60, was familiar with the crossing. He came from the south on this occasion and, according to his testimony, as he approached he saw defendant's diesel engine with two or three cars attached standing on the south track, headed east, a short distance west of the crossing. The exact place where the engine stood is a little uncertain. Plaintiff estimated it on two or three occasions as 30 or 40 feet west of the crossing, and on at least one occasion as 30 to 40 feet from where he was sitting in his truck as he drove up and stopped. His statement is that he approached at a speed of 15 or 20 miles an hour, which he gradually slowed to a complete stop a short distance south of the south rail; that at that time the engine appeared to be standing still with no activity about it; no whistle blew and no bell was ringing. Simultaneously with his stopping or immediately thereafter he rolled down the window on his left side, looked out at the engine on his left, then rolled his window back up and simultaneously or near-simultaneously looked to the east toward Lebanon to see if anything was coming from that direction, started his motor, threw his 1947 model Dodge truck into gear and started on across the track. He said he never heard the diesel "start up." "If it did I of course had my mind looking off the other way." After his front wheels crossed the south rail he "started" to look back to the west and just as he did so the train was upon him. The interval of time required by all of these activities occupied, by plaintiff's estimate, somewhere from less than 30 seconds to a minute and a half. Again, he said he thought his truck stood before the crossing between 10 and 30 seconds. According to plaintiff's testimony the front "corner" of the engine caught the truck and dragged it eastward a distance of 30 to 40 feet before it stopped. Two witnesses, one of whom was standing in the front of the Dampier garage but facing another direction, and one within the garage, supported plaintiff to the extent that they said they heard no whistle or bell, although they heard the crash of the collision.

The testimony given by members of the defendant's train crew was to the effect that the diesel engine was an all-purpose road switcher with two cabooses. Previously on that day it and its crew had been to the west "doing work train work" and at the time of the collision they were coming in for dinner and intended to take the switch track, the entrance of which lay immediately east of the crossing. As they came east toward the crossing the engine was first stopped a mile or more to the west at an "A" block signal in order to get permission to proceed. The engine then came on east and halted at a "stop and proceed" signal located somewhere between 360 and 400 feet west of the crossing. It then proceeded easterly toward the switch track entrance on the other side of the crossing. Members of the train crew testified that the crossing signals were given. The engineer said he saw plaintiff approaching in his truck at a speed of approximately 18 to 20 miles per hour, that plaintiff did not stop; and his testimony would at least justify the inference that plaintiff ran into the side of the front portion of the engine. The engineer said he applied his brakes in full after the engine was already into the crossing. According to the train crew members, the engine came to a stop a distance of somewhere between eight and twenty feet east of the crossing (depending upon which of their estimates is accepted), but whether they meant by this the front or rear of the engine is not apparent. The speed of the engine upon entering the crossing was variously estimated by train crew members at somewhere between five and ten miles per hour. Defendant produced a witness with a speed tape which he said indicated the train was traveling eight to ten miles an hour. Of this more anon.

Appellant makes 19 assignments of error, 11 of which can be grouped under its point

that plaintiff did not make a submissible case bottomed on his theory that the train was standing, stopped, some 30 to 40 feet west of the crossing, because such was a physical impossibility and opposed to the physical facts presented by the speed tape of defendant's train, which was admitted into evidence as defendant's Exhibit B. One Williams, defendant's road foreman of equipment, produced this tape, upon which were 16 horizontal lines, every other one of which was numbered, by the 10's, from zero to 70. These lines represented speed in miles per hour. The lines were broken at regular intervals, perhaps (although not so marked) to designate distance. Along such tape ran a jagged or uneven pencil mark supposedly indicating the speed of the train. The witness testified that the purpose of the tape was to register speed from one terminal to another at all points as long as the engine was in motion. He said it would show whether a stop had been made at any particular point, but as we understand his testimony this determination, i. e., the place of stopping, was made by laying a profile of the railroad alongside the tape and correlating the two. He did not identify and there was not offered in evidence any such profile. He testified that as an engine comes into the terminal a maintenance man goes to the speed recorder, removes the tape, marks it for identity and then it is taken to the master mechanic's office, where it is filed in the records. This witness, in interpreting the exhibit in relation with the profile, testified that it showed a stop at a signal a mile and a half west of the "stop and proceed" signal whereat a second stop was made at a point 350 to 400 feet west of the crossing, and that no other stops were made until after the crossing was passed. He was not the custodian or person in charge of such record. He did not himself remove the tape from the recorder on the engine, nor did he know what person had removed it, who marked it as referring to the date and the engine involved nor when it was removed. It first entered his knowledge when he went to the master mechanic's office where it was kept, and read it. As to the accuracy of the speed tape, he was of the opinion that, using the profile as an adjunct, he could tell that it would show the point of stopping within a maximum variation of 25 feet (a variation in both directions would be 50 feet). He indicated a possibility of some variation if the engine slipped. He did not know whether that occurred in this instance. Apparently curves in the road have some effect upon this function. He also left some confusion, perhaps in the mind of the jury and certainly in the mind of the readers of the transcript, by his explanation, or lack of explanation, as to why a longitudinal space of a half-inch on the tape would in one instance represent a mile and a half and in another instance one-half of such space, or a quarter-inch, would indicate a distance of only 350 to 400 feet. No explanation was made as to what would happen in regard to the longitudinal spaces if a work train was in motion part of the time going backward.

We think we have condensed and related sufficient of the testimony to demonstrate the total inadequacy of this exhibit and its interpretation to serve as *incontrovertible* proof of any fact. Infallibility of the recorder was neither admitted nor established. If it was infallible, the accuracy of its companion necessary to interpretation in regard to the place of stoppage, to-wit, the profile, was not shown and was not admitted. Had these two facts been admitted, there would still remain the question of whether this was the identical tape from the identical engine upon the identical date. We are doubtful if the witness was either the custodian "or other qualified witness" necessary to establish even its admissibility, Section 490.680 RSMo 1949, V.A.M.S.; and lastly the fallibility and credibility of the sponsoring witness in making his interpretations from the speed tape and its companion profile would have been for the jury in any event (see Williamson v. St. Louis Public Serv-

ice Co., 363 Mo. 508, 252 S.W.2d 295, 298, and cases cited). The "physical facts" rule applies only when the occurrence is inherently impossible or in conflict with the indisputable facts or laws of nature. It does not apply to degrees of probability or where there are involved variable or doubtful estimates in respect to the facts or to the credibility of witnesses. See 88 C.J.S., Trial, § 208(5), p. 441; see cases collated, West's Missouri Digest, Evidence, (c, j, q). Obviously when the physical facts themselves are in dispute or not conceded, estimates and positions based on oral testimony cannot be accepted to exclude plaintiff's cause of action because contrary to natural laws. Young v. Missouri-Kansas-Texas R. Co., Mo.Sup., 100 S.W.2d 929. It requires an extraordinary case for the court to disregard sworn testimony as manifestly improper and untrue, and such testimony is rejected only when the conclusion is so clear and indisputable as to leave no room in the reasonable mind for the entertainment of any other conclusion.[1] The courts are reluctant to draw arbitrary conclusions (see Hardin v. Illinois Central R. Co., 334 Mo. 1169, 70 S.W. 2d 1075, 1079), even though it appears from the record that the preponderance of the evidence is greatly in favor of such conclusion. Scott v. Kurn, 343 Mo. 1210, 126 S.W.2d 185, 186. We find no decisions dealing with speed tapes, but it has been held that train sheets showing the location of stops, et cetera, while entitled to great weight, do not completely overrule other evidence in conflict therewith. Chapple v. St. Louis & H. R. Co., Mo.App., 284 S.W. 863, and cases cited at loc. cit. 864. It is our conclusion that defendant's contention as to these assignments is not well taken and it was for the jury to say and believe whether or not the train was in the position testified by plaintiff.

 The second group of assignments deals with the more difficult question of whether the court erred in overruling defendant's motion for directed verdict because (so it is contended) plaintiff was guilty of contributory negligence as a matter of law in driving upon the crossing in front of the train. It is suggested that inasmuch as plaintiff did not file a reply to or deny defendant's plea of contributory negligence the allegations of such are to be taken as admitted. We are not prepared to hold that Section 509.010 RSMo 1949, V.A.M.S., and the sections following it require a reply to an answer such as a plea of contributory negligence, which such answer does not ask for affirmative relief and to which the only pleading could be a denial; but, be that as it may, if a reply was required, defendant waived it by failing to ask for a default, by going to trial on the issues and by submitting contributory negligence in its own instructions. Hodgson v. Pixlee, Mo.Sup., 272 S.W.2d 222, 226; Walker v. Huddleston, Mo.App., 261 S.W.2d 502, 505, and cases cited.

 In considering this question of contributory negligence we must remember that in determining whether defendant's motion for directed verdict should have been sustained we consider only the evidence and inferences therefrom most favorable to the verdict and disregard all evidence of the defendant except that which is favorable to the plaintiff, Helton v. Huckeba, Mo.Sup., 276 S.W.2d 78, 79; Vosburg v. Smith, Mo.App., 272 S.W.2d 297, 303, for the jury may believe all of the testimony of any witness for the plaintiff or the defendant, or none of it, or may accept it in part and reject it in part, as long as the testimony so accepted is not at war with the trial theory of the success-

ful party.[2] Contributory negligence may be established as a matter of law only when reasonable minds could not differ as to plaintiff's negligence, and whenever the facts are in dispute or the evidence is such that fair-minded men may draw different inferences the question is for the jury.[3]

■ Appellant correctly states and cites authority for the law which we attempt to condense, into one statement: There can be no question that one who drives a truck up to and upon a railroad crossing is held to exercise the highest degree of care. A railroad track is in itself a warning of danger and one who approaches it is required to exercise his faculties and make use of his eyes and ears to discover danger. This duty is one which continues until he reaches the crossing. He will be held to have seen and heard what he should have seen and heard.[4]

■ It has sometimes been stated that no one has the right to fail to exercise a reasonable amount of diligence to guard his own safety by assuming there will not be a violation of law or negligence of others.[5] But this rule, stated as a generality, is softened by another, which is that a wayfarer, having made a proper investigation as to his safety on a crossing, seeing a train standing in the vicinity with no indication of activity and no signal that it

is about to move, is not required to sit indefinitely and wait until such engine either proceeds or goes backwards, for the wayfarer does have a right to assume that such engine will be operated in compliance with the law and that those in charge of it will give some warning to those who are about to cross or who are in the act of crossing before putting the engine in motion.[6] The two rules in respect to this right to assume are not in reality antagonistic and they shade together at the edges just as surely as the colors of the rainbow blend their hues. The application depends upon the exigencies of the situation and the circumstances of the individual case, where are balanced the needs, duties and abilities of one person against those of another. An examination of the cases indicates that it is usually just a question of degree. " * * * if the danger depends at all upon the action of any other person, under a given set of circumstances, the prudence of the party injured must be estimated in view of what he had a right to expect from such other person, * * *." Gratiot v. Missouri Pac. R. Co., Mo.Sup., 19 S.W. 31, loc. cit. 34. In determining the question of contributory negligence at a crossing each case must be decided upon its own individual facts. Dyer v. Kansas City Southern Ry. Co., 223 Mo.App. 1001, 25 S.W.2d 508, 511; Fortner v. St. Louis Public Service Co., Mo.Sup., 244 S.W.2d 10, 13.

2. Heitz v. Voss Truck Lines, Mo.Sup., 175 S.W.2d 583, 584; Pabst v. Armbruster, Mo.App., 91 S.W.2d 652, 657; Brown v. Alton R. Co., 236 Mo.App. 26, 151 S.W. 2d 727, 741; Ralston Purina Co. v. King, Mo.App., 101 S.W.2d 734.

3. Dickerson v. Terminal Railroad Ass'n of St. Louis, Mo.Sup., 284 S.W.2d 568; Adkins v. Boss, Mo.Sup., 290 S.W.2d 139; Gillaspie v. Louisiana & M. R. R. Co., Mo.App., 260 S.W. 547, 549.

4. Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, 892; Rowe v. Henwood, Mo.App., 207 S.W.2d 829, 835; Kelsay v. Missouri Pac. Ry. Co., 129 Mo. 362, 30 S.W. 339; Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S.W.2d 764; Weis v. Melvin, Mo.Sup., 219 S.W.2d 310, 311; Branscum v. Glaser, Mo.Sup., 234 S.W.2d 626, 627; Tietze

v. New York, C. & St. L. R. Co., Mo. Sup., 250 S.W.2d 486, 488; Empire District Electric Co. v. Rupert, 8 Cir., 199 F.2d 941.

5. Tietze v. New York, C. & St. L. R. Co., supra, 250 S.W.2d loc. cit. 488; Caldwell v. Kansas City, P. & G. Ry. Co., 58 Mo.App. 453, 455; see Threlkeld v. Wabash R. Co., Mo.Sup., 269 S.W.2d 893, 895.

6. 75 C.J.S., Railroads, § 802, p. 73; Gratiot v. Missouri Pac. R. Co., 116 Mo. 450, 21 S.W. 1094; Gillaspie v. Louisiana & M. R. R. Co., Mo.App., 260 S.W. 547, 549; Fusili v. Missouri Pac. R. Co., 45 Mo.App. 535, 540; Eubank v. Kansas City Terminal Ry. Co., 346 Mo. 436, 142 S.W.2d 19, 24; see authorities cited in St. Louis & S. F. Ry. Co. v. Dawson, 64 Kan. 99, 67 P. 521.

In this case the plaintiff saw the engine. He exercised vigilance by stopping and in rolling down his window to get a better look at the engine. It was stationary. Its whistle did not sound and its bell did not ring, and there was no person or activity about it indicating any intention to proceed. He rolled up his window and started his truck forward and over the rail, the whilst looking to the east to see if any train approached from that direction. This division of his attention by looking to the east was something which he was *bound in law to do*. He would have been guilty of negligence for failure so to do. He is not to be charged with that diversion of his time or attention. Doyle v. Missouri, Kansas & Texas R. Co., Mo.App., 185 S.W. 1175, 1178, and cases cited. The plaintiff was no Janus bearing two faces and able to look in both directions at the same time, and "* * * we know of no rule of law requiring a party to constantly look even one way, and especially none requiring him to constantly look both ways." Gratiot v. Missouri Pac. R. Co., Mo.Sup., 16 S.W. 384, 386, 16 L.R.A. 189. We are unwilling, and in fact unable, to tie together any definite distance which plaintiff traveled until he got upon the track with any definite period or interval of time. He says he stopped within 10 or 12 feet of the crossing, but he did not say, and no one asked him, and we do not know, whether this represented the distance from the south rail to the extreme front of his truck or to the spot or place where he was sitting at the wheel; nor can we say, if the engine was 30 to 40 feet from the crossing instead of from plaintiff's person, whether that distance is to be computed as being from the right of way line, the edge of the pavement, the center of the crossing, or where. As hereinbefore stated, the width of the crossing is in doubt. Plaintiff's estimates on elapse of time range from a minute and a half to less than 30 seconds.

Except in circumstances where some fixed marker delineates time or distance, all estimates, and especially those of lay witnesses who have no special reason for marking them in their memory ahead of time, are of necessity only approximate. In a great many instances a mathematician or engineer with a steel tape, a slide rule and a stop watch, working in the deliberate afterlight of an affair, might take one premise or one statement and from it work backward so as to calculate negligence or lack of negligence as a mathematical certainty. But in the ordinary affairs of life the wayfarer does not either previous to or at the time of his trouble exactly observe, calculate or mark with split-second certainty or geometrical exactitude the spaces of either time or distance. One driving up to a crossing does not say to himself, nor can he say, "My front bumper is now six feet, three and a half inches from the outer edge of the south rail, and the extreme east point of the cowcatcher is 22 feet and two inches from the extreme west edge of the pavement." Nor does he say, "I am now expending exactly two seconds in rolling up the window, one and a quarter seconds in craning my neck to look up the track to the east, three-quarters of a second do I lose by having my eyes tell my brain there is nothing coming from that direction and in directing my brain to telephone my body to put the truck in gear," and so on ad infinitum. Oftentimes all a party can do is to give estimates, and of course we cannot expect them to be exactly correct [see Long v. Mild, 347 Mo. 1002, 149 S.W.2d 853, 856, (1) and (2); Smith v. Siercks, Mo.Sup., 277 S.W.2d 521]. The jury is required to consider not only what evidence is spoken in language, but such inferences as may be reasonably drawn from the whole of the evidence, and by their verdict express their conclusion as to its total effect. Remembering that, as to contributory negligence, which we are now considering, the burden is on the defendant, we should not penalize the plaintiff if the defendant failed to elicit or was unable to obtain more exact information in regard to all the circumstances. The intensity of the noise which a diesel engine would necessarily make under the circumstances here

related [7] and the speed which it would or could attain within the distances here involved are not such matters of common knowledge as to require recognition by a jury or judicial knowledge of this court. (Defendant's witness testified that it would have taken 70 seconds to apply the power and move the train 30–40 feet, but the jury were not required to accept this estimate.) It is also to be remembered that the trainmen said they intended to enter the switch just east of the crossing and go to dinner, and the brakeman said he had gotten down (on the step?) because of such. Plaintiff's statement, which we must accept, is that the train was not moving, but whether or not, while motionless, it had power on and traction preliminary to movement we cannot say.

Contributory negligence is always a question for the jury for so long as reasonable men can draw different conclusions as to the existence or the absence of negligence. Hammontree v. Edison Bros. Stores, Inc., Mo.App., 270 S.W.2d 117, 124; Lloyd v. Alton R. Co., 348 Mo. 1222, 159 S.W.2d 267, 272. That this question (contributory negligence) has been difficult is indicated by the fact this opinion comes after rehearing. But we again conclude that, by putting the most becoming dress upon all the evidence favorable to plaintiff and adorning it with such inferences as might reasonably be drawn therefrom, and bearing in mind that any gaps or openings caused by *lack* of evidence (as distinguished from showing of facts made by plaintiff) are not to be charged against the plaintiff on the affirmative defense of contributory negligence, we are compelled to say that plaintiff made a presentable case, even though our own conclusions from the facts might well have brought us to a result different from that arrived at by the jury.

By its next assignment the appellant complains of plaintiff's instruction number 1, which submitted his case. This instruction told the jury that it was defendant's duty to either ring the bell or sound the whistle when the train was at a distance of at least 80 rods, or within a lesser distance from said crossing if in fact said train was started from a stopped position less than 80 rods from the crossing. The bell or whistle statute, now Section 389.990 RSMo 1949, V.A.M.S., was long ago construed to require the giving of the signal when the train approaches from a position of less than 80 rods away. Herring v. Wabash R. Co., 80 Mo.App. 562, 569; Spiller v. St. Louis, M. & S. Ry. Co., 112 Mo.App. 491, 495, 87 S.W. 43. The next complaint against the instruction is that it did not properly hypothesize the facts, gave the jury a roving commission and did not directly link the alleged negligence of the defendant to the collision. We think these contentions are without substantial merit. If the defendant thought the hypothesization was not sufficient it should have asked for clarifying or amplifying instructions. Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496.

Another of defendant's assignments is that the court erred in overruling its objections to argument of counsel for plaintiff. This argument was directed toward failure of the defendant to bring forward as a witness the man who wrote the identifying information on the speed tape. In support of its objection appellant cites Wilson v. Miss Hulling's Cafeterias, 360 Mo. 559, 229 S.W.2d 556, 562, and Russell v. St. Louis Public Service Co., Mo.Sup., 251 S.W.2d 595, 599. In the Wilson case the trial court sustained an objection to argument concerning the absence of a lawyer witness to a statement and the action of the trial court was upheld because "No issue was presented in this case that authorized or required the production of Miss Beall as a witness. Defendant could not support or bolster the testimony of its own witnesses by hearsay evidence." In the Russell case the argument was made that it was the duty of the party to bring in

certain doctors who had examined the plaintiff. Other doctors had testified as to his condition. It was held, 251 S.W.2d loc. cit. 599, that the rule with respect to unfavorable inferences due to failure to bring in a witness is subject to the condition that no such unfavorable inference is to be drawn from nonproduction of evidence unless it would have been superior to the evidence which was adduced.

In view of what we have said heretofore concerning the testimony of the witness who sponsored the speed tape, we think counsel was justified in calling the attention of the jury to the fact that the man who could identify it with certainty was not present; and in any event it is our opinion that such argument and ruling did not constitute harmful and reversible error.

The judgment of the circuit court is affirmed.

McDOWELL, P. J., and STONE, J., concur.